**MCI COMMUNICATIONS CORPORATION et al.**

v.

**AMERICAN TELEPHONE & TELEGRAPH COMPANY and the Bell Telephone Company of Pennsylvania, Appellants.**

No. 74–1104.

United States Court of Appeals, Third Circuit.

Argued April 2, 1974.

Decided April 15, 1974.

Charles Ryan, J. Hugh Roff, Jr., New York City, John B. King, Philadelphia, Pa., for appellants.

Lewis A. Rivlin, David J. Taylor, Vernon I. Zvoleff, Peabody, Rivlin, Lambert & Dennison, Michael H. Bader, Kenneth A. Cox, William J. Byrnes, Haley, Bader & Potts, Washington, D. C., Raymond W. Midgett, Jr., Dechert, Price & Rhoads, Philadelphia, Pa., for appellees; John R. Worthington, Washington, D. C., of counsel.

Before VAN DUSEN, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This appeal challenges a December 31, 1973, district court order granting a mandatory preliminary injunction in the nature of mandamus, pursuant to 47 U. S.C. § 406,[1] ordering defendants to provide plaintiffs with four specific types of interconnection services[2] and "such

Irving R. Segal, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa.,

---

1. 47 U.S.C. § 406 provides, *inter alia:*

"The district courts of the United States shall have jurisdiction upon the relation of any person alleging any violation, by a carrier subject to this chapter, of any of the provisions of this chapter which prevent the relator from receiving service in interstate or foreign communication by wire or radio . . . from said carrier at the same charges, or upon terms or conditions as favorable as those given by said carrier for like communication or transmission under similar conditions to any other person, to issue a writ or writs of mandamus against said carrier commanding such carrier to furnish facilities for such communication or transmission to the party applying for the writ: . . . ."

In view of the terms of F.R.Civ.P. 81(b), the parties apparently concede that pleading in relator form for mandamus is not now required. See McBride v. Western Union Tel. Co., 171 F.2d 1 (9th Cir. 1948).

2. The order (369 F.Supp. 1004, 1029) contains this language:

"Defendants The Bell Telephone Company of Pennsylvania and the American Telephone and Telegraph Company are Ordered to provide to plaintiffs:

(a) Interstate 'Foreign Exchange' service, comparable to AT&T's Series 2006–FX service offered under AT&T interstate Tariff 260, involving an MCI interstate circuit connected at MCI's local terminal to a business telephone arrangement supplied by defendant The Bell Telephone Company of Pennsylvania.

(b) Interstate services on a through basis utilizing local connecting facilities of The Bell Telephone Company of Pennsylvania to interconnect the local terminal facilities of MCI and one or more other specialized common carriers.

(c) Interstate private line services connecting common control switching arrangement (CCSA) facilities, involving connection of MCI's terminal to a CCSA facility supplied by The Bell Telephone Company of Pennsylvania, as is now done for AT&T when its Long Lines Department offers this service under AT&T's interstate Tariff 260.

(d) Interstate services terminating at the premises of plaintiffs' customers which are located in communities nearby to cities where MCI's terminals are situated, but outside the local service areas as defined by The Bell Telephone Company of Pennsylvania. These services require forms of interconnection regularly made available to Western Union and to AT&T's Long Lines Department, and include situations where part of the circuit to a remote customer's location is supplied by a second telephone company.

other interconnection facilities as are necessary to enable plaintiffs to furnish the interstate services they are authorized by the FCC to perform." Plaintiffs [3] (referred to in this opinion frequently as MCI) provide intercity transmission capability by microwave facilities, including, but not limited to, data transmission. Defendants (referred to in this opinion frequently as AT&T) supply local distribution service for MCI but contend that the district court erred in requiring them to supply the interconnection services described in the December 31, 1973, district court order.

The district court relied on these two Federal Communications Commission (hereinafter FCC) rulings as constituting the orders requiring defendants to provide the interconnection services mandated in its order:

A. Specialized Common Carrier Services, 29 F.C.C.2d 870 (1971).

B. Letter from Chairman of the FCC to the American Telephone & Telegraph Company dated October 4, 1973.

Assuming these documents constituted orders, their terms were only general in imposing any duty to provide interconnection services on defendants and their terms did not specify the furnishing of the inter-exchange service,[4] FX service and CCSA [5] service, to which plaintiffs contend they are entitled.

The Specialized Common Carrier Services proceeding was instituted by a Notice of Inquiry to Formulate Policy, Notice of Proposed Rule Making and Order, docketed as follows (24 F.C.C.2d 317 (1970)):

"In the Matter of Establishment of Policies and Procedures for Consideration of Application To Provide Specialized Common Carrier Services in the Domestic Public Point-to-Point Microwave Radio Service and Proposed Amendments to Parts 21, 43, and 61 of the Commission's Rules } Docket No. 18920"

The Purpose of This Proceeding was stated as follows (871–72 of 29 F.C.C. 2d):

"The *Notice* undertook to resolve in an overall policy and rule making proceeding certain basic policy and procedural questions (see paragraph 17 below) which appeared common to all of the applications and oppositions, prior to consideration of each proposal on its individual merits (*Notice*, paragraphs 3, 23–24). . . . . We further emphasized that after the broad policy and procedural questions in this proceeding have been decided, there may remain other specific, factual questions to be resolved by appropriate procedures when the applications are processed (*Notice*, paragraphs 3, 24). We stated (paragraph 24):

"Once these issues have been determined, we will consider each proposal

---

(e) Such other interconnection facilities as are necessary to enable plaintiffs to furnish the interstate services they are authorized by the FCC to perform."

3. MCI Communications Corporation is the parent of the other companies and is not a common carrier. All the other MCI carriers are common carriers subject to the Communications Act.

4. See Finding of Fact 20 at page 4 of district court opinion.

5. FX service and CCSA service are defined as follows in Findings of Fact 14 and 16 of the district court opinion:

    "14. FX (Foreign Exchange) service is a form of 'switched' service, which allows

a businessman located in one state to, in effect, maintain a local phone within another state. Under Foreign Exchange service, a businessman can be reached by customers in a different state and can himself reach another state through a telephone line which has the appearance to those customers of being a local telephone in their city.

    "16. Common Control Switching Arrangement (CCSA) is a private line system for linking the various offices of a large company through large switches on a local telephone company's premises instead of through the PBX switches on the customers' premises."

on its individual merits and follow such procedures as may be necessary to resolve any remaining questions pertinent to the particular set of applications. Each applicant will, of course, be required to make a satisfactory showing that it is qualified and that the service it seeks to offer is technically and economically sound and would otherwise serve the public interest."

As to MCI, paragraph 7 of the decision provided (874 of 29 F.C.C.2d):

"There are also pending applications by 17 MCI associated companies for portions of a proposed nationwide network to provide specialized private line communications services. The various MCI carriers propose to provide 'customized' communications channels tailored to the exact requirements of subscribers needing interoffice and intracompany communications, to meet newly developing data and specialized communications needs of the public at significantly low cost. . . . . Originally, MCI did not propose to provide end-to-end service. It was contemplated that local loop interconnection would be accomplished by the subscriber's private facilities or, for subscribers requiring only voice grade channels, by use of local land-lines of existing telephone companies. MCI has since filed a petition for rule making (RM 1700) to allocate the frequencies 38.6–40 GHz for a local Carrier Distribution Service."

The opinion continued at page 878 (paragraph 17) to list the issues to be considered, including issue E stated as follows:

"E. What is the appropriate means for local distribution of the proposed services?"[6]

At page 940–41 of 29 F.C.C.2d, the FCC concluded as to Issue E:

"157. We reaffirm the view expressed in the *Notice* (paragraph 67) that established carriers with exchange facilities should, upon request, permit interconnection or leased channel arrangements on reasonable terms and conditions to be negotiated with the new carriers, and also afford their customers the option of obtaining local distribution service under reasonable terms set forth in the tariff schedules of the local carrier. Moreover, as there stated, 'where a carrier has monopoly control over essential facilities we will not condone any policy or practice whereby such carrier would discriminate in favor of an affiliated carrier or show favoritism among competitors.' In view of the representations of AT&T and GT&E in this proceeding,[7] upon which we rely, and the self-interest of other independent telephone companies in not losing potential new business, there appears to be no need to say more on this question at this time. Should any future problem arise, we will act expeditiously to take such measures as are necessary and appropriate in the

6. At page 879 of 29 F.C.C.2d, this language appears:
"Finally, on Issue E the *Notice* proposed that new carriers and their customers should have the option of achieving local distribution through interconnection with local telephone carriers or through construction of independent local facilities and, in the latter connection, requested comments on the use of wire, cable, and/or radio—particularly frequencies in the vicinity of 11 GHz or in some portion of the spectrum above 11 GHz, such as 18 or 50 GHz (*Notice*, paragraphs 66–70)."

7. At page 939 of 29 F.C.C.2d, the decision contained this wording:

"AT&T says that: 'When the Commission determines that it is in the public interest to license additional intercity common carriers, we would be willing to discuss with them the technical arrangements required and appropriate charges for any connections required of the telephone companies.' GT&E states that, with adequate lead time, it will provide local distribution services to any authorized carrier. MCI claims to be encouraged by the statements of AT&T and GT&E on this score. Western Union urges the Commission not to pre-judge the technical and economic feasibility of interconnection in this proceeding, and to hold individual evidentiary hearings on interconnection for each new system."

public interest to implement and enforce the policies and objectives of this Decision.

"158. We also conclude that new carriers should have the option of constructing their own independent local facilities to provide end-to-end service. However, this record does not afford an adequate basis for any determination as to what radio frequencies should be made available for use in this conjunction. . . .

"159. Accordingly, we have decided to issue a further notice of proposed rule making on MCI's proposal to allocate the frequencies 38.6–40 GHz for a local carrier distribution service, and to include comparative consideration of frequencies in the other regions of the spectrum that have been suggested (11 GHz, 18 GHz, 30 GHz and 50 GHz . . . . We will issue the further notice as soon as possible and expedite the further proceedings on this question. For, we realize that this aspect should be resolved at an early date so that those authorized entrants contemplating local construction can plan and build such facilities without delay to the inauguration of the system.

. . . . . .

"We also conclude that further proceedings are necessary for a resolution of Issues D and E herein, and will retain full jurisdiction over those aspects of this proceeding."

[Footnotes in decision omitted.]

In Appendix C to the Decision, the comments of the participants on Issues A, B & E were summarized, but no significant claim by MCI of the right to have FX, CCSA or similar interconnection services (as opposed to the term "local distribution of proposed services") furnished by AT&T appears in *either the decision or its appendices*.

The October 4, 1973, letter order of the FCC was primarily focused on the contention of defendants that tariffs covering interconnections with plaintiffs should be filed with the state commissions, as opposed to with the FCC. It concluded with this language:

"[W]e do not accept the conclusion stated in your letter of September 28th that the arrangements described therein, including your proposal to file the subject tariffs with the state commissions, 'will achieve the Commission's objective stated in the Specialized Common Carrier case that the specialized carriers be afforded interconnection facility arrangements on reasonable terms and conditions'. To the contrary, we are of the view that effective implementation of our policy objectives and the statutory scheme of the Communications Act require that you promptly file tariff schedules with this Commission in accordance with Section 203 of the Communications Act which tariff schedules will provide the interconnection facilities essential to the rendition by the specialized carriers of all their authorized services on terms and conditions which are just, reasonable and non-discriminatory. Until such tariffs are filed and effective, there should be no delay in honoring requests of specialized carriers for interconnection facilities required by such carriers to terminate the services they are authorized by the Commission to furnish. Such facilities can be provided under contracts on an interim basis and we assume that this will be done."

On December 13, 1973, the FCC released at Docket 19896 a Memorandum Opinion and Order To Show Cause (484a) reciting conflicting points of view between plaintiffs and defendants, as well as certain differences between Western Union and defendants, which contained this wording:

"4. These matters raise interrelated questions concerning the lawfulness of the actions taken by AT&T and the Bell System companies with respect to the provision of interconnection facilities to the specialized carriers including Western Union and domestic satellite carriers. Our view is that prompt and effective action

should be taken to resolve these questions.  [485a]

.    .    .    .    .    .

"16.  Based on the record here before us, there appears to be no material disputed fact and thus no necessity for designating these matters for an evidentiary hearing. . . . These are questions of law which, in our judgment can be promptly resolved on brief and oral argument.  [492a]

.    .    .    .    .    .

"17.  Accordingly, It Is Ordered . . . that this matter is Designated for Oral Argument before the Commission, *en banc,* at its offices in Washington, D.C. on March 4, 1974 at 9:30 a. m.

"18.  It Is Further Ordered, That, AT&T, Bell Telephone Company of Pennsylvania, . . . jointly and severally are named respondents herein and Are Directed to Show Cause why all or any of them should not be ordered to cease and desist from:

.    .    .    .    .    .

(b) engaging in any conduct which results in a denial of, or unreasonable delay in establishing, physical connections with MCI for its authorized or pending interstate services;

(c) implementing any policy or practice which forecloses the establishment of through routes, and charges, facilities and regulations applicable thereto, in connection with MCI's authorized or pending interstate services;

.    .    .    .    .    .

(e) implementing any policy or practice which results in denying MCI interconnection privileges similar to those presently provided to AT&T's Long Lines Department in connection with its authorized or pending interstate services;

.    .    .    .

"19.  It Is Further Ordered, That the parties shall address themselves to the questions of whether (1) the Commission has heretofore ordered the telephone companies, pursuant to Section 201(a) of the Communications Act, to provide interconnection with MCI or whether such interconnection is otherwise required pursuant to rule or regulation within the meaning of Section 312 of the Act; (2) if so, (a) the scope of that order or rule or regulation with particular reference to interconnection for FX and CCSA services of MCI; (b) whether the telephone companies have complied with such order, rule or regulation and, (c) if they have not complied, the appropriate remedy, whether under Section 312 of the Act or otherwise; (3) if interconnection has not hitherto been ordered or required by rule or regulation whether it should be and, if so, upon what terms and conditions; .    .    .    .  [493a–494a]

.    .    .    .    .    .

"22.  It Is Further Ordered, That each respondent and party intending to participate in the oral argument shall file a brief on or before January 21, 1974, and a statement of intention to appear, specifying the amount of time requested for oral argument, by no later than December 27, 1973, and may file reply comments on or before February 4, 1974.    .    .    . " [495a]

The district court held that in order to be entitled to the relief provided for under 47 U.S.C. § 406 and granted by the district court order in this case, plaintiffs must show that defendants' "duties under the Act would have to be clear and unequivocal" (p. 32 of district court opinion).  See Baltimore & Ohio RR. v. Pitcairn Coal Co., 215 U.S. 481, 499–500, 30 S.Ct. 164, 54 L.Ed. 292 (1919).

■■    In this appeal, AT&T has advanced numerous contentions challenging the district court's grant of the preliminary mandatory injunction requiring AT&T to furnish the interconnections requested by MCI.  A principal contention of AT&T is that the district court should have refrained from granting relief, under the doctrine of "primary jurisdiction," until the FCC had an opportunity to pass upon such issues.  Under

the facts of this case, we have concluded that the district court erred in not staying any action by it, at the least after December 13, 1973, until the FCC had had an opportunity to act on its above-mentioned proceeding at Docket No. 19896 where argument was scheduled for and held on March 4, 1974, particularly because until that proceeding is resolved defendants will not have the "clear and unequivocal duties" referred to above at page 9 of this opinion. The Supreme Court, in Far East Conference v. United States, 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952), defined the doctrine of primary jurisdiction as

> "a principle, now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedures."[8]

The doctrine of primary jurisdiction has been developed by courts in order to avoid conflict between the courts and an administrative agency arising from either the court's lack of expertise with the subject matter of the agency's regulation or from contradictory rulings by the agency and the court. Under the doctrine, a court should refer a matter to an administrative agency for resolution, even if the matter is otherwise properly before the court, if it appears that the matter involves technical or policy considerations which are beyond the court's ordinary competence and within the agency's particular field of expertise.

This court recently had occasion to apply the doctrine of primary jurisdiction in Laveson v. Trans World Airlines, 471 F.2d 76 (3d Cir. 1972), when, in a suit alleging that airline companies unlawfully conspired to fix the price to coach passengers for the rental of headsets used with inflight motion pictures, we affirmed a district court's decision to stay its hand pending resort to the Civil Aeronautics Board for resolution of the question:

> "Because of the possibility that, in exercising its power over the subject matter of this controversy, the Board may approve the agreement here alleged to violate the antitrust laws, we hold that prior resort by plaintiffs to the CAB is required."

471 F.2d at 81.

We have concluded in this case, as in Laveson, that the district court should have deferred to the appropriate administrative agency, the FCC, under the doctrine of primary jurisdiction for two principal reasons. First, assuming, without deciding, that the Specialized Carrier decision and the FCC's October 4 letter are, as plaintiffs contend, valid interconnection orders,[9] there neverthe-

<hr>

8. The doctrine was created by the Supreme Court in Texas & Pac. Ry. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907). For general discussions of the doctrine and cases in which it has been applied, see Jaffe, Primary Jurisdiction, 77 Harv.L.Rev. 1037 (1964); von Mehren, The Antitrust Laws and Regulated Industries: The Doctrine of Primary Jurisdiction, 67 Harv.L.Rev. 929 (1954); Schwartz, Legal Restriction of Competition in the Regulated Industries: An Abdication of Judicial Responsibility, 67 Harv.L.Rev. 436 (1954).

9. AT&T has contended in this appeal that neither the Specialized Carrier decision nor the October 4 letter are valid interconnection orders under Section 201(a) of the Communications Act, 47 U.S.C. § 201(a). Because of our disposition of this appeal on primary jurisdiction grounds, resolution of this issue is unnecessary.

less remains a substantial question whether such orders embraced the particular types of interconnection requested by MCI in this case, namely, interconnections enabling MCI to provide FX and CCSA service and local connections reaching the premises of customers located outside local distribution areas ("interexchange services"). Secondly, even assuming that the types of interconnection requested by MCI appeared, at the time this suit was brought, to be embraced by the *Specialized Carrier* decision and the October 4 letter, the initiation of proceedings by the FCC on December 13, 1973, in which the FCC undertook to resolve the same issues raised by MCI in this suit, made it appropriate for the district court to defer to the FCC under the doctrine of primary jurisdiction in order to avoid conflict with the FCC in the resolution of those issues.

At the core of the dispute between the parties in this case lies the question of the existence and scope of any obligation on the part of AT&T, under the *Specialized Carrier* decision and the October 4 letter, to interconnect MCI into the switched network for FX or CCSA service or to provide it with local connections outside the local distribution area. An examination of these two Commission pronouncements reveals that the existence and scope of any such obligation on the part of AT&T is so unclear that deferral to the expertise of the FCC is both desirable and appropriate.

In its *Specialized Carrier* decision, the FCC did not mention FX, CCSA and interexchange services by name. Instead, the FCC merely stated that

> "established carriers with exchange facilities should, upon request, permit interconnection or leased channel arrangements on reasonable terms and conditions to be negotiated with the new carriers, and also afford their customers the option of obtaining local distribution service under reasonable terms set forth in the tariff schedules of the local carrier."

29 F.C.C.2d at 940. Likewise, in the October 4 letter, the FCC did not mention FX, CCSA and interexchange services by name in ordering AT&T to provide local distribution facilities. The FCC merely reaffirmed in general terms the language of its previous pronouncements:

> "[O]ur *MCI* and *Specialized Common Carrier* decisions made it clear that the Bell System companies . . . would be expected to provide, on reasonable terms and conditions, interconnection of such facilities as required by the specialized carriers to terminate the services which such specialized carriers have been duly authorized in the public interest by this Commission to provide.

> .  .  .  .  .  .

> "There should be no delay in honoring requests of specialized carriers for interconnection facilities required by such carriers to terminate the services they are authorized by the Commission to furnish."

The October 4 letter, while reaffirming that AT&T was expected to provide interconnection to terminate the services which the specialized carriers had been authorized to provide, failed to resolve the critical question of exactly what services the specialized carriers had been authorized to perform in the 1971 decision and whether FX, CCSA and interexchange services were properly required to be supplied in 1973 to plaintiffs' customers in light of the defendants' volume of business and facilities at this time.

MCI contends that the *Specialized Carrier* decision and the October 4 letter clearly embraced FX, CCSA and interexchange services, even though such orders did not mention such services in *haec verba*, because there was no reason for the FCC to be more specific and to distinguish among the different private line services offered by the specialized carriers. Specifically, MCI states that AT&T itself had never differentiated among various classes of private line

services but that it had simply opposed in general any competitive entry into the private line communications field by the specialized carriers. In addition, MCI asserts that AT&T's representation to the FCC that it would be willing to discuss arrangements "for any connections required of the telephone companies" made it unnecessary for the FCC to refer specifically to various types of private line services. Finally, MCI contends that the fact that the FCC used general language, rather than referring to specific types of private line services, indicates that its orders comprehended all of the then existing forms of private line communications, of which FX and CCSA were a part.

AT&T contends, on the other hand, that the *Specialized Carrier* decision and the October 4 letter do not comprehend interconnection into the switched networks of existing carriers. Specifically, AT&T points out that, in the comments filed by MCI with the FCC in the *Specialized Carrier* case, MCI repeatedly emphasized that it sought to offer "point-to-point" service connecting its customers' promises, and that "no switching between customers" in the switched network would be involved. AT&T argues that MCI also urged that the FCC should encourage existing carriers, including AT&T, to provide "local loops."[10] We have concluded that there was sufficient uncertainty concerning the existence and scope of AT&T's obligation to provide interconnections into the switched network for the FX, CCSA, and interexchange services that the district court should have deferred to the FCC in determining exactly what private line services had been authorized by the FCC. Deferral to the FCC under the doctrine of primary jurisdiction is particularly appropriate in this case not simply because of the fact of uncertainty concerning the issue of what private line services have been authorized, but also because of the nature of the issue. For a court to resolve this issue results in a judicial determination of the scope of permissible competition between the specialized carriers, such as MCI, and the existing carriers, such as AT&T. Such a determination, involving, as it must, the comparative evaluation of complex technical, economic, and policy factors, as well as consideration of the public interest, should be made, in the first instance, by the administrative agency which has been entrusted with the primary responsibility for making such a determination and which has the expertise necessary for the development of sound regulatory policy.[11]

---

10. AT&T emphasizes that the FCC, both in its notice of rulemaking and in the *Specialized Carrier* decision, repeatedly discussed interconnection in terms of "loop service," "loop facilities," and "loop[s] to the subscriber's premises." See 24 F.C.C.2d at 347; 29 F.C.C.2d at 874–76, 938–40. In the *Specialized Carrier* decision, the FCC also described MCI's position as being the "local distribution does not present any truly serious problem and that, with flexibility of approach, local loop facilities will be available in one form or another." 29 F.C.C.2d at 952.

11. We note that in the one case decided by this court involving an action under § 406 of the Communications Act, this court pointed out the applicability of the primary jurisdiction doctrine:
"The ostensible reason for appellants' refusal to challenge the reasonableness of the tariffs or of Bell's activity in terminating their service appears to be their reluctance to contend with the familiar doctrine of 'primary jurisdiction.' As stated in 3 Davis, Administrative Law Treatise § 19.01 at 3 (1958): 'The precise function of the doctrine of primary jurisdiction is to guide a court in determining whether the court should refrain from exercising its jurisdiction until after an administrative agency has determined some question or some aspect of some question arising in the proceeding before the court.' There can be little doubt that if appellants had attacked the reasonableness of Bell's practice or of the tariffs herein the district court would have found primary jurisdiction in either the Pennsylvania Public Utility Commission or the Federal Communications Commission." See Palermo v. Bell Telephone Co. of Pennsylvania, 415 F.2d 298, 300 n. 4 (3d Cir. 1969).

■ Despite the above considerations, the district court determined "that the purposes of the primary jurisdiction doctrine would not be served by a preliminary referral of this matter to the FCC." The district court gave three reasons for this conclusion:

"First, the questions raised by the plaintiffs' motion for a preliminary injunction and defendants' opposition to it are all within the ordinary experience of the judiciary; the Court is not being asked to decide whether interconnection is necessary, convenient or in the public interest, nor is it being asked to pass upon the reasonableness of tariffs filed with the FCC. Second, a preliminary referral to the FCC would be futile because the FCC, in its orders in Docket No. 18920 and in the letter to AT&T's Emerson dated October 4, 1973, has already passed upon the question of the scope of AT&T's duties in the present matter. Third, the fact that the FCC has already ruled upon the interconnections in question removes the danger of inconsistent rulings, since this Court will merely be enforcing the FCC's orders."

We do not find this reasoning persuasive. As to the first reason, we do not feel that the difficult issue of whether the interconnection services requested by MCI are embraced by the *Specialized Carrier* decision and the October 4 letter is within the ordinary experience of the judiciary, but, even assuming that it is, the Supreme Court has indicated that the primary jurisdiction doctrine may be applicable in such a situation. In Far East Conference v. United States, *supra*, 342 U.S. at 574, 72 S.Ct. at 494, the Court stated that the doctrine of primary jurisdiction may apply "even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined." The district court's second reason, namely, that the FCC has already ordered AT&T to provide the interconnections requested by MCI, merely begs the central and difficult issue in the case. Finally, the third reason is unpersuasive since the FCC's initiation of proceedings on December 13 to examine whether it has ordered AT&T to provide the interconnections requested by MCI clearly raises the possibility of inconsistent rulings by the district court and the FCC. It is precisely this problem of inconsistent judicial and administrative rulings which the primary jurisdiction doctrine is designed to avoid. See Atchison, T.&S.F. Ry. v. Wichita Board of Trade, 412 U.S. 800, 821, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973).[12] That the possibility of such inconsistent rulings is not remote in this case is indicated by a recent statement by counsel for the FCC to the United States Court of Appeals for the Second Circuit that, in the proceeding initiated by the December 13 order, "the Commission could rule that it was never its intention to allow MCI to provide 'FX' or 'CCSA' service." [13]

In addition to the above-enumerated reasons why the district court should have applied the doctrine of primary jurisdiction in the instant case, we have concluded that the initiation of proceedings by the FCC on December 13, 1973, made application of the doctrine even more appropriate. In its Memorandum Opinion and Order to Show Cause, dated

---

12. In *Atchison, supra*, the Supreme Court, in vacating an injunction against railroad rates, noted:

"[T]he issuance of an injunction pending further administrative action may indicate what the court believes is permitted by national transportation policy, prior to an expression by the Commission of its view. This is precisely what the doctrine of primary jurisdiction is designed to avoid." 412 U.S. at 821, 93 S.Ct. at 2382 (1973).

13. See Appendix at 758a.

December 13, 1973, the FCC directed AT&T and other interested parties to file briefs and present oral argument on a number of issues relating to interconnection. Among the issues which the Commission requested the parties to address were the questions "whether (1) the Commission has heretofore ordered the telephone companies, pursuant to Section 201(a) of the Communications Act, to provide interconnection with MCI, or whether such interconnection is otherwise required . . . ;" (2) if so, the scope of any such requirement "with particular reference to interconnection for FX and CCSA services;" and (3) "if interconnection has not hitherto been ordered or required by rule or regulation whether it should be, and, if so, upon what terms and conditions."

This action by the FCC indicates at the very least that the existence and scope of interconnection orders requiring AT&T to furnish the interconnection services requested by MCI are open to legitimate dispute.[14] In light of the uncertainty concerning interconnection raised by the FCC itself in the institution of this proceeding, the district court should have awaited resolution of the interconnection issues by the FCC.

For the foregoing reasons, the December 31, 1973, district court preliminary injunction order will be vacated and the case remanded with directions that proceedings in the district court be stayed and jurisdiction be retained.[15] The certified judgment in lieu of mandate or the mandate shall issue forthwith.[16]

APPENDIX TO OPINION OF APRIL 15, 1974, in MCI COMMUNICATIONS CORPORATION, et al. v. AMERICAN TELEPHONE & TELEGRAPH COMPANY, et al., No. 74–1104

Excerpts from Appendix C of
Specialized Common Carriers Services, 29 F.C.C.2d 870, 949 ff. (1971)

The summary of the Comments and Reply Comments of plaintiffs, defendants, Western Union, and United States Independent Telephone Association include the following:

I. *Plaintiffs*

A. "The MCI Carriers (MCI) urge the Commission to spin-off Issues A and B for immediate decision, and to commence processing applications pending a resolution of Issues C–E on which no serious problem is anticipated. . . ." (page 949)

B. *"Local distribution*

"MCI believes that local distribution does not present any truly serious problem and that, with flexibility of approach, local loop facilities will be available in one form or another. It notes similar views by others filing in this proceeding. Where existing carriers have circuits of the required quality at reasonable rates, subscribers of the specialized carriers should be encouraged to employ such facilities.

---

14. In its "Memorandum Opinion and Order," released February 11, 1974, denying the request of AT&T for an evidentiary hearing, the FCC stated:

"Among the matters upon which we have directed the parties to comment are questions going to whether the Commission had heretofore ordered Bell to provide interconnection pursuant to Section 201(a) of the Act, whether such interconnection is required pursuant to rule or regulation within the contemplation of Section 312 and, if so, the scope of the order or rule or regulation with particular reference to interconnection for FX and CCSA services. In our view these and other legal and policy issues discussed in our order scheduling oral argument should be resolved as expeditiously as possible . . . . " See *Appendix* at 860a–861a.

15. See Laveson v. Trans World Airlines, *supra*, 471 F.2d at 84.

16. The motion by appellants to supplement the appendix, filed March 22, 1974, has been granted.

MCI states that it is encouraged by statements of AT&T and GT&E in this proceeding concerning interconnection. However, if local telephone company interconnection is unsuitable, there appear to be a variety of possibilities as reflected in the comments filed by equipment manufacturers in this proceeding." (page 952)

## II. Defendants

### "Issue E—Local Distribution

"In general, AT&T believes that a carrier should accept total responsibility for its service. The end-to-end concept clearly fixes responsibility, is conducive to lower administrative costs, precludes a carrier from choosing the more profitable portions of an overall service and leaving the more difficult and expensive portions to others, and avoids problems of possible subsidization of one carrier by another. However, there may be situations where this is impracticable. Bell has connecting arrangements with other common carriers and has a tariff offering of entrance facilities for connection to customer-provided facilities. It states: 'When the Commission determines that it is in the public interest to license additional intercity common carriers, we would be willing to discuss with them the technical arrangements required and the appropriate charges for any interconnection required of the telephone companies.' " (page 962)

## III. Western Union

"Issue E—Local Distribution: Western Union urges the Commission not to pre-judge the technical and economic feasibility of interconnection, but rather to hold hearings on such questions. It further asserts that new construction of alternative facilities would involve such a high initial investment that it could only be supported by high density users in a small area and may make it impossible to serve all customers even in a confined area. The Commission should study posible use of frequencies above 17 GHz in a separate proceeding. While the MCI petition for rule making is consonant with this recommendation, Western Union believes that evidentiary hearings are required. . . . " (page 965)

## IV. United States Independent Telephone Association

"Issue E—The Commission's jurisdiction to require independents to make new service offerings over local facilities is doubtful, and in the case of connecting carriers is limited. In any case, interconnection may pose problems for telephone companies and it should be required only after a hearing to develop specific facts. . . . " (page 966)