**PHONE–TEL COMMUNICATIONS, INC., et al., Plaintiffs,**

v.

**AT & T CORPORATION, et al., Defendants.**

No. CIV.A. 98–6486.

United States District Court, E.D. Pennsylvania.

June 12, 2000.

Sherrie R. Savett, Philadelphia, PA, Roberta D. Liebenberg, Liebenberg & White, Jenkintown, PA, Richard J. Abt, Ledgewood Law Firm, Kenneth L. Fox, Law Offices of Kenneth L. Fox, Philadelphia, PA, for Phone–Tel Communications, Inc., Plaintiffs.

Edward F. Mannino, Akin Gump Strauss Hauer & Feld LLP, J. Kevin Fee, Akin, Gump, Strauss, Hauer & Feld, LLP, Philadelphia, PA, Paul C. Drecksel, Hatch and James, Salt Lake City, UT, William A. Jones, Swartz, Campbell & Detweiler, Phila, Mark W. MC Grory, Sprint Corporation Law Department, Kansas City, MO, Ronald P. Schiller, Piper, Marbury, Rudnick & Wolfe, LLP, Phila, for AT & T Corporation, Sprint Corporation, MCI Worldcom, Inc., Defendants.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

### I. BACKGROUND

This is an action brought by plaintiff Phone–Tel Communications, Inc. (plaintiff) against defendants AT & T Corporation, Sprint Corporation, and MCI Worldcom, Inc. (collectively defendants), alleging violations of the Telecommunications Act of 1996 (the Act). Plaintiff is a payphone service provider (PSP) that owns and operates payphones across the country. Defendants are interexchange carriers (IXC's), commonly known as long distance telephone companies.

Plaintiff alleges, in what it terms a "simple collection" case, that defendants have not paid it for calls which defendants' customers completed by using payphones owned by plaintiff. Defendants, on the other hand, argue that because plaintiff's complaint raises technical and policy issues within the expertise and discretion of the Federal Communications Commission (FCC), the court should refer this matter to the FCC under the doctrine of primary jurisdiction and either dismiss the case, or

in the alternative, stay these proceedings pending action by the FCC. Before the court are defendants' motions to dismiss plaintiff's complaint, or in the alternative, to stay these proceedings. The court concludes that because plaintiff's claim raises certain technical and policy issues within the special competence of the FCC, those issues shall be referred to the FCC in the first instance for resolution and the case shall be stayed pending consideration of those issues by the FCC.

## II. DISCUSSION

### A. *The Doctrine of Primary Jurisdiction*

#### 1. *The parties' contentions*

In the Telecommunications Act of 1996, Congress required the FCC to promulgate regulations "ensuring that payphone service providers would be 'fairly compensated' for calls made on their payphones." *MCI Telecommunications Corporation v. Federal Communications Commission*, 143 F.3d 606, 607 (D.C.Cir.1998).[1] Pursuant to the direction of Congress, the FCC established a compensation system requiring IXC's such as defendants to compensate PSP's such as plaintiff on a per call basis for each call their customers complete from a payphone owned by the PSP.

Plaintiff seeks relief under the Act in the form of an accounting requiring defendants to: (1) identify the number of calls their customers completed from plaintiff's payphones beginning on October 6, 1996; (2) establish that the procedure employed in making that identification was performed accurately and in accordance with FCC regulations; and (3) compensate plaintiff using the applicable per call compensation rate for each identified call.

Defendants contend that this is not a "simple collection" case, as plaintiff claims, but rather the case implicates "a myriad of outstanding technical, interpretive and policy issues" that fall squarely within the expertise and discretion of the FCC. Defendant MCI Worldcom, Inc.'s Motion to Dismiss (Doc. No. 10), p. 2. Thus, according to defendants, the court should stay its hand and refer the matter to the FCC under the doctrine of primary jurisdiction.

#### 2. *Applicable case law*

■ The doctrine of primary jurisdiction applies "to claims properly cognizable in court that contain some issue within the special competence of an administrative agency." *Reiter v. Cooper*, 507 U.S. 258, 113 S.Ct. 1213, 1220, 122 L.Ed.2d 604 (1993). Under the doctrine, "a court should refer a matter to an administrative agency for resolution, even if the matter is otherwise properly before the court, if it appears that the matter involves technical or policy considerations which are beyond the court's ordinary competence and within the agency's particular field of expertise." *MCI Communications Corporation v. American Telephone & Telegraph Company*, 496 F.2d 214, 220 (3d Cir.1974); *see also MCI Telecommunications Corporation v. Teleconcepts, Inc.*, 71 F.3d 1086, 1103 (3d Cir.1995) ("Primary jurisdiction 'applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administra-

---

1. Specifically, the Act provides:

In order to promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general public, within 9 months after February 8, 1996, the Commission shall take all actions necessary (including any reconsideration) to prescribe regulations that-

(A) establish a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using their payphone, except that emergency calls and telecommunications relay service calls for hearing disabled individuals shall not be subject to such compensation....

47 U.S.C.A. § 276(b)(1)(A) (1999).

tive body.' ").[2] The Supreme Court described the doctrine of primary jurisdiction as

> a principle, now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedures.

*Far East Conference v. United States*, 342 U.S. 570, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952).[3]

Courts have been cautioned, however, not to instinctively invoke the doctrine of primary jurisdiction "whenever a controversy remotely involves some issue falling arguably within the domain of the agency's 'expertise.'" *Teleconcepts*, 71 F.3d at 1104. Rather, courts are commanded to examine each issue identified by the party proposing application of the doctrine to determine whether resolution of the specific issue requires the special competence of an administrative agency. *Id.* (*quoting Elkin v. Bell Telephone*, 491 Pa. 123, 420 A.2d 371, 377 (1980)).

The party urging the court to refer the matter in whole or in part to an administrative agency bears the burden of persuading the court that the case "requires resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Id.* at 1103. If the moving party satisfies its burden and the court finds that specific and discrete issues in the case require attention from the appropriate administrative agency, the issues identified by the court shall be referred to the administrative agency for its consideration in the first instance.

3. Issues which implicate the doctrine of *primary jurisdiction*

■ Defendants identify four (4) specific issues implicated in this case that they

**2.** The Third Circuit has stated that the doctrine of primary jurisdiction applies when decision-making "is divided between courts and administrative agencies [and] calls for judicial abstention in cases where protection of the integrity of a regulatory scheme dictates primary resort to the agency which administers the scheme. [I]t is now generally accepted ... that the principal justification [for the doctrine] is the need for an orderly and sensible coordination of the work of agencies and courts." *Cheyney State College Faculty v. Hufstedler*, 703 F.2d 732, 736 (3d Cir.1983).

**3.** There is no fixed formula for determining whether the doctrine of primary jurisdiction applies. *See United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956); *FBN America, Inc. v. Athena International, L.L.C.*, 1997 WL 698492, *3 (E.D.Pa.1997); *American Telephone & Telegraph Co. v. People's Network, Inc.*, 1993 WL 248165, *4 (D.N.J.1993); *Frontier Communications of Mt. Pulaski, Inc. v. AT & T Corp.*, 957 F.Supp. 170, 176 (C.D.Ill. 1997). The key question is whether the policies supporting application of the doctrine are present in each case. *See Western Pacific*, 77 S.Ct. at 165, *People's Network*, 1993 WL 248165, at *4, *Frontier Communications*, 957 F.Supp. at 176. Some courts have found the following four factors helpful in determining whether to apply the doctrine: "(1) Whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) Whether the question at issue is particularly within the agency's discretion; (3) Whether there exists a substantial danger of inconsistent rulings; (4) Whether a prior application to the agency has been made." *AT & T Corp. v. PAB, Inc.*, 935 F.Supp. 584, 589–90 (E.D.Pa.1996); *Oh v. AT & T Corporation*, 76 F.Supp.2d 551, 557 (D.N.J.1999) (*citing American Telephone & Telegraph, Co. v. People's Network, Inc.*, 1993 WL 248165 (D.N.J. 1993)).

contend should be referred to the FCC. First, defendants note that, for part of the period for which plaintiff seeks relief, the FCC has not promulgated a per call compensation rate. Second, defendants argue that because certain third parties have not implemented particular technology as ordered by the FCC, defendants are unable to determine whether every call made by their customers was completed from any of plaintiff's payphones. Third, defendants argue that plaintiff's complaint reaches outside the scope of the Act in that it demands payment for calls that have not been "completed," as that term has been defined by the FCC. Finally, defendants argue that plaintiff's complaint attempts to hold them responsible for payments that, according to the FCC, are due not from defendants, but from carriers that purchase long distance services from defendants.[4]

### a. *Absence of rate issue*

Plaintiff argues that the court can arrive at the correct amount owed to plaintiff by defendants by multiplying the number of calls each defendant completed from plaintiff's payphones during the relevant time period by the applicable per call compensation rate established by the FCC under the Act. In response, defendants point out that the FCC has never established a rate for the time period beginning November 7, 1996 and ending October 6, 1997, a period covered by this lawsuit. Accordingly, defendants contend, because a per call compensation rate for the entire time covered by plaintiff's complaint is necessary to grant plaintiff the relief it seeks, and un-

der the Act, the creation of a per call compensation rate is left to the discretion and expertise of the FCC, the court must refer the issue to the FCC.

The establishment of appropriate payment rates under a regulatory scheme is a paradigmatic subject of agency expertise. Here, "[t]he FCC is the expert regulatory agency on affairs relating to telecommunications carriers." *PAB, Inc.*, 935 F.Supp. at 590; *see also Unimat v. MCI Telecommunications Corporation*, 1992 WL 391421, *2 (E.D.Pa.1992). Indeed, Congress expressly granted the FCC the authority and discretion to establish "a per call compensation plan" to ensure that IXC's fairly compensate PSP's for calls completed from the PSP's payphones. *See* 47 U.S.C.A. § 276(b)(1)(A). As part of its responsibilities under the Act, it is the FCC's duty to "prescribe just and reasonable charges." *PAB, Inc.*, 935 F.Supp. at 590. Thus, the FCC, not the court, must establish a per call compensation rate for the time period November 7, 1996 to October 6, 1997.[5]

### b. FLEX–ANI technology issue, facilities based reseller issue, and completed call *issue*

The remaining three issues which defendants contend also require referral to the FCC involve interpretation of current FCC orders. The test for determining whether administrative agency orders should be interpreted by the agency which first issued them or by the court has been set forth by the Supreme Court. "When the words of a written instrument are used in their ordinary meaning, their construc-

---

4. Plaintiff does not dispute that the issues raised by defendants are issues that require resolution in this case or that the court may appropriately consider these issues in determining whether to refer the matter to the FCC.

5. Additionally, a substantial danger of inconsistent rulings exists if the court were to establish a compensation rate for the relevant time period in this case. The FCC is currently considering the rate that should apply to

the time period beginning November 7, 1996 and ending October 6, 1997. Therefore, if the court were to undertake a parallel determination of an issue pending before the FCC, there would be a "substantial danger" that any rate established by the court would be inconsistent with the rate promulgated by the FCC. *See PAB, Inc.*, 935 F.Supp. at 589–90 (identifying "substantial danger of inconsistent rulings" as factor to consider in determining whether to apply doctrine of primary jurisdiction).

tion presents a question solely of law," but "where words ... are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application, so that 'the inquiry is essentially one of fact and of discretion in technical matters,' then the issue of [application of an administrative agency's orders] must first go to the [administrative agency]." *Great Northern Ry. Co. v. Merchants' Elevator Co.*, 259 U.S. 285, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922); *Western Pacific*, 77 S.Ct. at 166 (*citing Great Northern*). Referral to the agency for interpretation of its own orders is appropriate, according to the Court, because a determination of the meaning of words used in a "peculiar or technical" sense is "reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of [the industry] is indispensable, and such acquaintance is commonly to be found only in a body of experts." *Great Northern*, 42 S.Ct. at 479; *Western Pacific*, 77 S.Ct. at 166 (*citing Great Northern*).

(1) *FLEX–ANI technology issue*

In order for IXC's such as defendants to learn whether a completed call originates from a payphone, the local exchange carrier (LEC), which transmits payphone calls from the payphone to the IXC for completion, must identify the origin of the call. To promote efficiency and uniformity within the telecommunications industry, the FCC has ordered all LEC's to install flexible automatic numbering identification (FLEX–ANI) technology, which attaches a particular code to calls that originated from payphones.[6] Certain of the LEC's,

however, claim that for various technological and economic reasons, they have not been able to uniformly implement FLEX–ANI technology. According to defendants, because of the LEC's inability to uniformly implement FLEX–ANI technology, the IXC's are unable to determine whether a call originates from a payphone or from a non-payphone station. Defendants further argue that because resolution of the problems created by the LEC's failure to implement FLEX–ANI technology involves policy considerations affecting the entire telecommunications industry, it is best left to the FCC.

Establishing defendants' obligation to compensate plaintiff where defendants are unable to determine whether a call originates from a payphone requires an interpretation of the FCC's order instructing LEC's to implement FLEX–ANI technology. In turn, interpreting the FCC's order requiring implementation of FLEX–ANI technology presents the issue of which party, the PSP or the IXC, should bear the risk of non-payment for the LEC's inability to implement FLEX–ANI technology. There are at least two alternatives to allocating this risk. First, the risk may be assigned to the PSP's by requiring the PSP's to wait for compensation until the IXC's are able to affirmatively identify each completed call. Second, the risk may be assigned to the IXC's by requiring the IXC's to pay the PSP's according to a per phone, rather than a per call, compensation rate, subject to a later reimbursement.[7] The choice between these and perhaps even other alternatives requires the exercise of 'discretion in technical matters,' *Great Northern*, 42 S.Ct. at 479 (quotation omitted), and a policy judgment based

---

6. "Thus, we conclude that all LECs must implement FLEX ANI to comply with the requirements set forth in the *Payphone Orders*, subject to any waivers provided herein." *FCC Memorandum Opinion and Order of March 9, 1998,* ¶ 23. The "Payphone Orders" referenced in the FCC's order are prior orders issued by the FCC governing the relationship between IXC's and PSP's.

7. In the past, in an attempt to address this problem, the FCC has granted the LEC's extensions of time within which to install FLEX–ANI technology and required IXC's to compensate PSP's on a per-payphone, rather than a per-call, basis, recognizing that the PSP's may be overpaid and later pay a refund to the IXC's.

upon the relative competitive positions of each entity within the telecommunications industry. *See MCI Communications Corp.*, 496 F.2d at 222 (finding that issues concerning "the scope of ... competition" are better left for the administrative agency).

This choice also requires knowledge of which alternative would cause the least amount of disruption to the telecommunications industry. In other words, the court must scrutinize the reasons for the LEC's failure to implement FLEX–ANI technology, an inquiry which places the court in the vortex of "the highly regulated and competitive industry in which these parties compete." *PAB, Inc.*, 935 F.Supp. at 591. Until these technological concerns are addressed by the FCC, defendants' obligations under the Act are unclear.

Not to be overlooked is that the FCC is currently receiving and considering public comment on how best to handle the problems resulting from the LEC's failure to implement FLEX–ANI technology. Thus, there is a "substantial danger" of inconsistent rulings if the court were to address the issue simultaneously with the FCC. *See People's Network*, 1993 WL 248165, * 6 ("It would be impossible for the FCC to fulfill its function of regulating the long distance telephone market if numerous federal district courts also undertake to decide the substantial questions which directly or indirectly affect the position of the carriers within the market."). Therefore, these concerns, in conjunction with one another, warrant referral of this issue to the FCC.

#### (2) Facilities Based Resellers *(FBR's)*

A facilities based reseller (FBR) maintains its own "switching capability," but purchases long distance transmission services from an IXC in bulk, and then provides long distance services to its customers. Motion to Dismiss of MCI Worldcom, Inc. (Doc. No. 10), p. 17. Defendants contend that plaintiff incorrectly seeks payment from them, as IXC's, where a call

made from its payphones was completed using long distance services purchased by an FBR. According to defendants, an existing FCC order requires the FBR, not the IXC, to compensate plaintiff. Defendants further contend that the FCC should resolve a dispute over the meaning of its order.

At issue is the following order issued by the FCC:

> We clarify that a carrier is required to pay compensation and provide per-call tracking for the calls originated by payphones if the carrier maintains its own switching capability, regardless if the switching equipment is owned or leased by the carrier.... If a carrier does not maintain its own switching capability, then, as set forth in the *Report and Order* and consistent with our clarification here, the underlying carrier remains obligated to pay compensation to the PSP in lieu of its customer that does not maintain a switching capability.

*FCC Report and Order of October 9, 1997.* Like interpretation of the FCC's order requiring LEC's to implement FLEX–ANI technology, interpretation of this order involves technical factors "the adequate appreciation of which" requires great familiarity with the intricacies of the telecommunications industry. *Western Pacific*, 77 S.Ct. at 166.

Part of the difficulty in interpreting this order is that, by its plain meaning, it does not squarely address the issue before the court in this case. The order instructs that where a carrier maintains its own switching capabilities, it is required to pay compensation for calls originated from payphones. The order, however, does not identify which of the carriers (the FBR or the IXC) is to compensate a PSP where one carrier with its own switching capabilities (the FBR) purchases long distance services from another carrier also with its own switching capabilities (the IXC), the circumstances present here. Thus, it may well be that the FCC did not intend the

order to apply to the instant factual situation.

Whether the order applies to the instant factual situation or not, determining whether an FBR or an IXC from which an FBR purchases long distance services must compensate a PSP for calls completed from its payphones also requires a determination of which entity should bear the risk of non-payment. In other words, to adjudicate this issue, the court would be required to decide, between several possible alternatives, whether the FCC's order requires an IXC to compensate the PSP first and then seek reimbursement from the FBR, or whether it imposes primary responsibility for payment upon the FBR. This determination involves "[c]omplex cost allocation and accounting problems." *Western Pacific*, 77 S.Ct. at 166. There are reasons peculiar to the telecommunications industry that inform a decision why either an FBR or an IXC should compensate a PSP for calls completed from its payphones. It logically follows, therefore, that an interpretation of the FCC's order requires a great degree of familiarity with those reasons, a familiarity held by the FCC, not the court. *See, e.g., id.* ("To answer that question there must be close familiarity with these factors. Such familiarity is possessed not by the courts but by the agency which had the exclusive power to [decide the question] in the first instance."); *FBN America, Inc.*, 1997 WL 698492, at *4 ("Here, although it is true that, 'considered broadly,' Plaintiff's claims under the Act 'involve[ ] the sort of statutory interpretation in which courts regularly engage., . . . considered more specifically' these claims also involve numerous, interrelated technical and policy questions that are beyond this court's ordinary experience and squarely within the primary jurisdiction of the FCC.").

Finally, a decision concerning the relationship between IXC's and FBR's has the potential to establish competition policy for the entire telecommunications industry. Because both have switching capabilities and the ability to sell long distance service to common customers, FBR's are in direct competition with IXC's. *See PAB, Inc.*, 935 F.Supp. at 588. Thus, a decision on this issue rendered by the court could affect the competitive dynamics between IXC's and FBR's and unintentionally initiate changes throughout the telecommunications industry. *See MCI Communications Corp.*, 496 F.2d at 222 (finding that issues concerning "the scope of . . . competition" are better left for the administrative agency). Given the current climate of technological change affecting the telecommunications industry, these sensitive issues should be left initially to the FCC for resolution.

### (3) *Definition of "completed" call*

The Act mandates that the FCC promulgate regulations requiring IXC's to compensate PSP's only for "completed" calls. *See* 47 U.S.C.A. § 276(b)(1)(A). The FCC has defined a "completed" call as one "answered by the called party." *FCC Report and Order of September 29, 1996.* The parties dispute whether a call may be deemed "completed" solely by virtue of its duration.[8]

In *Western Pacific*, the Court instructed that whether matters of statutory interpretation should be referred to an administrative agency must be "based on the particular facts of each case." *Western Pacific*, 77 S.Ct. at 167–68. The Court further instructed that where the question of interpretation is "so intertwined" with another issue within the expertise of the administrative agency "that the same factors are determinative on both issues, then

8. Defendants assert that "PSP's . . . apparently speculate that any call that lasts for more than a certain period of time (e.g., 45 seconds) has been completed." Defendant MCI Worldcom, Inc.'s Motion to Dismiss (Doc. No. 10), p. 3. Plaintiff has not represented to the court that it in fact takes the position attributed to it by defendants. Nevertheless, the court will assume that the parties interpret the term, "completed," differently.

it is the [FCC] which must first pass on them." *Id.* at 168.

At first glance, the issue of what constitutes a "completed" call appears to be one of statutory interpretation well within the conventional experience of judges. Were the scope of the definition of a "completed" call the only issue before the court, the court would be disinclined to defer to the FCC. However, the definition of a "completed" call is dependant upon the LEC's ability to implement FLEX–ANI technology, an issue the court has already referred to the FCC. FLEX–ANI technology permits IXC's to identify a call made from a payphone and track that call to determine whether it has been completed. For the court to divine a definition of a "completed" call without an informed appreciation of the technology needed to implement it in the first place would be an empty gesture. *Cf. Allnet Communication Service, Inc. v. National Exchange Carrier Association, Inc.,* 965 F.2d 1118, 1122 (D.C.Cir. 1992) ("In any event, it would make little sense to refrain from applying primary jurisdiction merely because of an ancillary claim that we would reach only after examination of ones clearly within the agency's purview."). Because the scope of the definition of a "completed" call is closely intertwined with the problems created by the LEC's inability to implement FLEX–ANI technology, the definition of a "completed" shall also be referred to the FCC for resolution.

### D. *Plaintiff's Equitable Argument*

Plaintiff advances the equitable argument that referring the matter to the FCC will further delay the compensation to which it claims it is entitled, and that this delay will seriously injure its continued business operations. According to plaintiff, defendants are large corporations that could afford to advance the payments requested by plaintiff without suffering economic hardship. Plaintiff also argues, in the alternative, that the court could establish an interim rate for the time period of November 7, 1996 to October 6, 1997, and that if the FCC later sets a lower rate, plaintiff could be required to refund the overpayment.

■ Plaintiff's equitable arguments are misplaced because application of the doctrine of primary jurisdiction is not discretionary. Rather, once the court determines that a claim "contain[s] some issue within the special competence of an administrative agency, [the doctrine of primary jurisdiction] *requires* the court to refer the matter to the administrative agency." *Reiter,* 113 S.Ct. at 1220 (emphasis added). Thus, regardless of the equities involved, referral to the FCC, in the first instance, of issues which the court finds are within the FCC's special competence is mandatory.

### E. *Appropriate Disposition*

■ Where the court determines that there are issues in a case within an administrative agency's discretion and expertise, "the judicial process is suspended pending referral of such issues to the administrative body for its views." *Western Pacific,* 77 S.Ct. at 165. Referral of an issue to an administrative agency "does not deprive the court of jurisdiction" over the case. *Reiter,* 113 S.Ct. at 1220.[9] The court may retain jurisdiction, or if the parties would not be "unfairly disadvantaged," it may dismiss the case. *Id.* at 1220.

The court finds that dismissal of the case would "unfairly disadvantage[ ]" plaintiff in two ways. First, plaintiff would

9. Use of the term, "referral," to describe the process by which technical and policy issues arrive before the administrative agency is somewhat misleading. In actuality, the judicial proceedings are simply stayed while the parties are given a reasonable opportunity to petition the FCC for a decision on those issues. *See Reiter,* 113 S.Ct. at 1220, n. 3. Unlike, for example, remand or transfer, the Clerk is not charged with the duty to deliver the file and docket to the transferee court. Initiation of the proceedings in the administrative forum remains the responsibility of the parties.

be deprived of its chosen forum. Congress vested the court with concurrent jurisdiction over plaintiff's claim, and the doctrine of primary jurisdiction does not alter that grant.[10] *See Reiter*, 113 S.Ct. at 1220. Rather, the doctrine of primary jurisdiction requires only that the court refer certain discrete issues raised in the case, in the first instance, to the appropriate administrative agency. In this case, after the FCC has been given an opportunity to address the issues referred to it by the court, plaintiff shall be entitled to return to its chosen forum to proceed to final judgment.

Second, plaintiff could not receive the class-wide relief it seeks before the FCC. Plaintiff filed its complaint as a class action. The FCC is not empowered to certify a class action under Federal Rule of Civil Procedure 23. Thus, the case will be stayed pending consideration by the FCC of the issues outlined above.[11]

## III. CONCLUSION

The court concludes that plaintiff's claim raises technical and policy issues requiring application of the doctrine of primary jurisdiction. However, the court also concludes that dismissal of the case would "unfairly disadvantage[ ]" plaintiff, therefore, these proceedings will be stayed pending consideration by the FCC on the issues covered in this memorandum.

An appropriate order follows.

### ORDER

AND NOW, this 12th day of June, 2000, upon consideration of Defendant Sprint Corporation's Motion to Dismiss (doc. no. 9), Defendant MCI Worldcom, Inc.'s Motion to Dismiss (doc. no. 10), and Defendant AT & T Corp.'s Motion Pursuant to Fed.R.Civ.P. 12(b)(1) to Dismiss, or in the Alternative, to Stay Pending Referral of this Action to the Federal Communications Commission (doc. no. 11), it is hereby **ORDERED** that the motions are **GRANTED**.

It is **FURTHER ORDERED** that the following issues are **REFERRED** to the Federal Communications Commission for its consideration:

1. Creation of a per call compensation rate for the period November 7, 1996 to October 6, 1997;

2. The effect of the LEC's failure to implement FLEX–ANI technology;

3. Whether IXC's or FBR's are required to compensate PSP's for calls completed from their payphones using long distance services purchased by FBR's; and

4. The scope of the definition of a "completed" call.

It is **FURTHER ORDERED** as follows:

1. Further proceedings in this case are **STAYED** pending resolution of plaintiff's claims under the Telecommunications Act of 1996 by the Federal Communications Commission;

2. The case shall remain in **SUSPENSE** until further order of the court; and

3. An in-person status conference shall be held on **November 2, 2000** at **9:15 a.m.**

---

10. "Any person claiming to be damaged by any common carrier ... may either make complaint to the Commission ... or may bring suit in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies." 47 U.S.C.A. § 207.

11. Referral of all issues to the FCC for adjudication in the first instance does not make the referral permanent. The court retains jurisdiction over the case and has merely stayed the case. Accordingly, nothing in this memorandum or accompanying order shall prevent plaintiff from seeking termination or modification of the stay based upon a change in circumstances, undue delay by the FCC in addressing the issues herein referred to it for adjudication, or for any other equitable or legal reasons as may be warranted. Nor shall this memorandum or accompanying order preclude the parties from requesting the court to re-activate the case after the FCC resolves some, but not all, of the issues referred to it for consideration.

in Courtroom 7–A, 7th Floor, United States Courthouse, 601 Market Street, Philadelphia, PA. At least 72 hours prior to the status conference, each party shall deliver to the court a written status report which shall identify with specificity any issue the party wishes to discuss at the status conference.

**AND IT IS SO ORDERED.**