APCC SERVICES, INC.,
et al., Plaintiffs,

v.

WORLDCOM, INC., Defendant.

No. CIV.A. 01–638(ESH).

United States District Court,
District of Columbia.

Dec. 21, 2001.

David Clarke, Jr., Sara Z. Moghadam, Piper, Rudnick LLP, Washington, DC, for Defendant.

Edward George Modell, Dickstein, Shapiro, Morin & Oshinsky, L.L.P., Washington, DC, for Plaintiffs.

## MEMORANDUM OPINION

HUVELLE, District Judge.

The central issue facing the Court is whether to stay on grounds of primary jurisdiction three related actions that are currently before it, pending referral to the Federal Communications Commission ("FCC" or the "Commission"). The three actions are *APCC Services, Inc. v. WorldCom, Inc.*, Civil No. 01–638, *APCC Services, Inc. v. Qwest Communications Corp.*, Civil No. 01–641, and *APCC Services Corp. v. Sprint Communications Company L.P.*, Civil No. 01–642. Defendants have moved to dismiss or stay pending resolution of certain central issues by the FCC.[1] Plaintiffs have opposed, and have instead moved the Court to appoint a special master pursuant to Fed.R.Civ.P. 53, as it did in a prior related action, *APCC Services v. AT & T Corp.*, Civil No. 99–696.[2] Based on a thorough consideration of the pleadings and the entire record therein, the Court finds that these actions do not require further resolution of issues within the special competence of the FCC, and therefore defendants' motions to dismiss or stay will be denied. This Memorandum Opinion constitutes the Court's ruling in all three of these actions.

## BACKGROUND

### I. The Payphone Industry

Plaintiffs—APCC Services, Inc. ("APCC"), Data Net Systems, L.L.C., Jaroth, Inc. d/b/a Pacific Telemanagement Services, Intera Communications Corp., and Davel Communications Corp.—are assignees and attorneys-in-fact for over 1,000 payphone service providers ("PSPs"). These plaintiffs represent more than 400,000 of the 500,000 to 600,000 payphone lines in the United States. (First Amended Complaint ¶ 1.) The three defendants—WorldCom, Inc. ("WorldCom"), Qwest Communications Corp. ("Qwest"), and Sprint Communications Company L.P. ("Sprint")—are three of the four largest interexchange telephone carriers in the United States.[3] All parties are major players in the payphone industry, a field that has recently seen a great deal of flux with respect to the proper system for billing and revenue-sharing. Plaintiffs have brought suit under 47 U.S.C. § 206, seeking unpaid compensation from defendants for all dial-around calls made from their telephones and carried by defendants from October 1, 1998 to the present.

There are currently about 2.4 million payphones in the United States. Most telephone calls made from payphones are either "coin calls"—in which the calling party deposits coins directly into the payphone—or "coinless calls"—such as directory assistance, operator service, access code, and subscriber 800 calls. This case involves coinless calls.

A coinless payphone call is initially received by the local exchange carrier ("LEC") that serves the payphone. The LEC then routes the call to an interexchange carrier ("IXC"), which is also known as the first facilities-based carrier.

---

1. Qwest has moved only to dismiss.

2. Two other related actions that had been pending before the Court—*APCC Services, Inc. v. Cable & Wireless, Inc.*, Civil No. 01–701, and *APCC Services, Inc. v. Global Crossing Telecommunications, Inc.*, Civil No. 01– 710—were both dismissed without prejudice by the plaintiffs.

3. The fourth carrier is AT & T Corporation, which has also been sued by APCC in a related case pending before the Court.

The IXC then does one of two things with the call. In most cases, it will "switch" and transmit the call to the LEC serving the call recipient, thereby "terminating" the call. In other cases, a second entity with its own switching capability will resell the first facilities-based carrier's services and perform the switching and transmission functions itself. These entities are known as facilities-based resellers ("FBRs"). PSPs own or lease the payphones, and are entitled to compensation from either the facilities-based carrier or the FBR for each completed call. *See In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket No. 96–128, Second Order on Reconsideration, 2001 WL 332794 (F.C.C.), at *5–6 (¶ 12) (Apr. 5, 2001) [hereinafter *Second Order on Reconsideration*].

All three defendants are facilities-based carriers. Sprint, for example, handles approximately 432 million payphone calls per year, transmitting an estimated 104 million of these to FBRs, and terminating the rest either on its own behalf or for resellers that lack switching capacity. Sprint currently serves approximately 110 FBRs and has direct payment relationships with over 1,300 PSPs. (Sprint Mem. at 3.) FBRs and PSPs have separate, independent payment relationships.

## II. FCC Payphone Compensation Rules

This case involves a dispute between PSPs and IXCs over compensation for certain telephone calls made from plaintiffs' payphones and carried by defendants. The calls include both "dial-around" and "toll-free" calls, two types of coinless calls that are indistinguishable for compensation purposes. Both types of calls at issue are thus commonly referred to as "dial-around

calls." APCC asserts that the defendants have not paid all the compensation that they owe for dial-around calls. The FCC's complex rules regarding payphone compensation are central to this case.

In 1996, Congress passed the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (1996), and directed the FCC to "prescribe regulations that [ ] establish a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using their payphone[s]." 47 U.S.C. § 276(b)(1). Since then, the FCC has tried to follow Congress' direction, issuing numerous reports, orders, and clarifications relating to payphone compensation.

### A. Tracking and Compensation Responsibility

In *In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket No. 96–128, Report & Order, 11 F.C.C.R. 20,541, 1996 WL 547458 (1996) [hereinafter *First Payphone Order*], the FCC defined a "completed" call for compensation purposes as "a call that is answered by the called party." *Id.* at 20,573 (¶ 63). This definition was affirmed by the agency as recently as November 21, 2001. *See In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket No. 96–128, Third Order on Reconsideration ¶ 7, 2001 WL 1477886 (Nov. 21, 2001) [hereinafter *Third Order on Reconsideration*]. The FCC also held that the first facilities-based carrier was in the best position to monitor payphone calls to completion and should therefore be responsible for compensating the PSP for all completed calls. *Id.* at 20,590 (¶ 97).

Upon reconsideration, however, the FCC determined that FBRs were also capable of tracking calls to completion. Because the FBRs were the "primary economic beneficiar[ies]" of the calls that they terminate, the agency found that they should be separately responsible for compensating the PSPs for those calls. *In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket No. 96–128, Order on Reconsideration, 11 F.C.C.R. 21,233, 21,-277, 1996 WL 658824 (¶ 92) (1996) [hereinafter *Order on Reconsideration*]. Facilities-based carriers remained responsible for compensating PSPs for all other completed calls. Both facilities-based carriers and FBRs were authorized to develop their own tracking and compensation systems to comply with these rules. *Id.* at 21,278 (¶ 93); *First Payphone Order*, 11 F.C.C.R. at 20,590–91 (¶¶ 96–97).

In April 2001, the FCC reaffirmed that a facilities-based carrier that terminates a payphone call is responsible for compensating the PSP. Next, the agency found that the FBR owed compensation to the PSP for a call it terminated only if the FBR had identified itself to the facilities-based carrier as responsible for paying compensation. *Bell Atlantic–Delaware, Inc. v. Frontier Communications Services, Inc.*, Mem. Op. & Order, File No. E–98–48, 2001 WL 327916, 2001 WL 327619 (F.C.C.) (Apr. 5, 2001) [hereinafter *Bell Atlantic Order*].

The logical construction of the language from the [1998] Coding Digit Waiver Order requires a first facilities-based carrier to pay [compensation to PSPs] unless the [FBR] has identified itself to the first facilities-based carrier as being responsible for paying compensation.

*Id.* ¶ 14. The FCC also held that facilities-based carriers should identify the FBRs responsible for paying compensation upon request by a PSP. *Id.*

While the *Bell Atlantic Order* addressed retroactive and contemporaneous issues of compensation and tracking, the FCC issued a second order on the same day that dealt with the same topics prospectively. In the *Second Order on Reconsideration*, the FCC held that as of November 23, 2001, the compensation scheme set forth in the *Bell Atlantic Order* would cease to be in effect. Instead, the agency reallocated payment and tracking responsibilities to facilities-based carriers for all coinless calls. *Second Order on Reconsideration* ¶ 16. "[T]he carrier responsible for compensating [the PSP] for coinless calls is the first facilities-based interexchange carrier *to which a completed coinless access code or subscriber 800 payphone call is delivered by the LEC unless another carrier comes forward and identifies itself to the PSP as the party liable for compensating the PSP.*" *Id.* ¶ 9. The facilities-based carriers must then seek reimbursement from the FBRs for the calls that the FBRs terminate. *Id.* ¶ 18.[4]

The FCC recently affirmed these rules in the *Third Order on Reconsideration*.[5]

4. Sprint appealed these rules under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, to the United States Court of Appeals for the D.C. Circuit and simultaneously moved for a stay. Sprint contends, among other things, that the FCC failed to comply with the APA and the agency's own regulations in promulgating the rules. *See Sprint Corp. v. FCC*, No. 01–1266 (D.C.Cir.

June 12, 2001). The FCC declined to stay implementation of these rules pending appeal. *In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket No. 96–128, Order at 2, 2001 WL 838857 (July 26, 2001).

5. The *Third Order on Reconsideration* was issued on November 21, 2001, after briefing

In that order, the Commission "decline[d] to modify the rules as established in the *Second Order on Reconsideration*." *Third Order on Reconsideration* ¶ 2. In response to a challenge by WorldCom, the FCC affirmed its "longstanding definition of 'completed' calls to mean calls completed to the called party." *Id.* ¶ 7. Moreover, the agency reiterated that "the first IXC [must] track or arrange for tracking of each call to determine whether it is completed and therefore compensable," particularly because of the variety of options available to the carriers to perform the tracking function. *Id.* ¶ 10.

### B. Per–Call Compensation

The FCC's attempts to establish payphone compensation rates since 1996 has followed a similarly tortuous path. In addition to an initial attempt at allocating responsibility for PSP compensation, the *First Payphone Order* addressed compensation rates. First, for an interim period between November 6, 1996 and October 6, 1997, the FCC ordered compensation at a flat rate of $45.85 per payphone per month. *First Payphone Order*, 11 F.C.C.R. at 20,601, 20,604 (¶¶ 119, 125). After that interim period, the FCC established a fixed rate of $0.35 to the PSP for each compensable dial-around call made from a payphone. 47 C.F.R. § 64.1300; *First Payphone Order* ¶ 51. Both rates, however, were vacated by this Circuit for lack of sufficient evidence in the administrative record. *Illinois Pub. Telecomms. Ass'n v. FCC*, 117 F.3d 555, 564–65 (D.C.Cir.1997).

On remand, the FCC revised the per call rate to $0.284 for all calls made after October 6, 1997, but it did not re-establish any rate for the interim period. *In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket No. 96–128, Second Report & Order, 13 F.C.C.R. 1778, 1779 (¶ 1), 1997 WL 868694 (1997) [hereinafter *Second Rate Order*]. However, that second rate was also remanded to the FCC by this Circuit for further explanation. *MCI Telecomms. Corp. v. FCC*, 143 F.3d 606, 609 (D.C.Cir.1998). On a second remand, the FCC retroactively adjusted the rate for calls made between October 7, 1997 and April 20, 1999 to $0.238 per call. *In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket No. 96–128, Third Report & Order & Order on Reconsideration of the Second Report & Order, 14 F.C.C.R. 2545, 2635 (¶ 196), 1999 WL 49817 (1999) [hereinafter *Third Rate Order*]. The *Third Rate Order* also established a new rate of $0.24 per call for calls made on or after April 21, 1999. *Id.* at 2552 (¶ 14). Finally, the FCC held that facilities-based carriers and FBRs could recover the overpayments made when the unlawful per month and per call rates were in effect through offsets to future compensation. The FCC did not establish a new compensation plan for the interim period, however, and therefore the offsets could not yet be recovered. *Id.* at 2636–37 (¶¶ 197–98). This Circuit affirmed the *Third Rate Order*. *American Pub. Communications Council v. FCC*, 215 F.3d 51, 58 (D.C.Cir. 2000).

The per call compensation scheme applies, however, only to payphone lines for

was completed on the motions currently before the Court. Regardless, none of the parties brought the FCC's ruling in the *Third Order on Reconsideration* to the attention of the Court, which is especially puzzling in light of the fact that the ruling appears to definitively resolve at least two of the issues that defendants argue should be referred to the FCC.

which the LEC had implemented technology to track and record compensable calls. There are two forms of this technology— "FLEX ANI" software, which is installed on payphone lines, and "ANI ii" digits, which are "hard coded" on a payphone itself. *See In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket No. 96–128, Mem. Op. & Order, 13 F.C.C.R. 4998, 5000 n. 8, 5009–10 (¶¶ 2, 19–20) (March 9, 1998), at ¶¶ 2 n. 8, 19 & 20, 1998 WL 99371 [hereinafter *Bureau Coding Digit Waiver Order*]. This technology allows an LEC to transmit to the carrier a numeric code that identifies calls made from a PSP's payphones. Without FLEX ANI or ANI ii technology, the facilities-based carriers cannot simultaneously track which calls are compensable. *First Payphone Order* ¶ 99. If FLEX ANI or ANI ii is not available for a given phone line, the carrier can pay a flat monthly amount for that line. *In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket No. 96–128, Mem. Op. & Order, 13 F.C.C.R. 10,893, 10,901–15 (¶¶ 16–35), 1998 WL 153171 (Apr. 3, 1998) [hereinafter *Per–Phone Compensation Order*].

The FCC originally ordered LECs to implement FLEX ANI by October 7, 1997, but later extended that deadline to March 9, 1998. *In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket No. 96–128, Order, 12 F.C.C.R. 16,387, 16,389–90, 16,391–92 (¶¶ 8–9, 17), 1997 WL 614948 (Oct. 7, 1997) [hereinafter *Bureau Waiver Order*]. The agency then extended the deadline a second time by creating a separate deadline for each payphone line served by the LEC—so that the deadline would be the date on which the LEC pro-

vided FLEX ANI for at least 25 percent of the "smart" payphones in a given "area," although LECs could also apply for extensions of the deadline up to December 31, 1998. *Bureau Coding Digit Waiver* ¶¶ 36, 71. The FCC now assumes that all LECs have implemented FLEX ANI technology on all non-ANI ii payphone lines for which compensation is billed per-call; in reality, however, the software is not in place everywhere, and even where it has been installed, there have been significant technological problems, such as the failure of the system to transmit the correct code.

For all phones with ANI technology, payment to PSPs is due by the end of the quarter following the quarter for which compensation is owed, with an 11.25 percent interest penalty for late payment. *Per–Phone Compensation Waiver Order* ¶ 3; *Third Report & Order* ¶ 189; *Bell Atlantic Order* ¶ 17 n. 43. Within thirty days after the close of each quarter, the LEC submits to each facilities-based carrier a list of all payphone numbers, or ANIs, that were valid for the quarter, and identifies the PSP that owned each ANI. *First Report and Order* ¶ 112. The carrier then uses this list to identify the amount due each PSP. *Id.* Payphones that do not transmit FLEX ANI digits are not eligible for per-call compensation.

> Once per-call compensation becomes effective, we clarify that, to be eligible for such compensation, payphones will be required to transmit specific payphone coding digits as part of their ANI, which will assist in identifying them to compensation payors. Each payphone must transmit coding digits that specifically identify it as a payphone, and not merely as a restricted line.

*Order on Reconsideration* ¶ 64.

In sum, the current payphone compensation regulatory structure requires that

PSPs must be compensated for all calls answered by the called party. For all calls prior to November 23, 2001, the facilities-based carrier is responsible for compensating the PSP unless an FBR both terminated the call and identified itself to the carrier as the party responsible for paying compensation. For all calls on or after November 23, 2001, the first long distance carrier to which a dial-around call is switched must compensate the PSP, and thereafter seek reimbursement from any FBR to which the call is switched.[6] For all calls made between October 7, 1997 and April 20, 1999, the per-call rate of compensation is $0.238; for all calls made on or after April 21, 1999, the per-call rate is $0.24. The FCC has not yet established a rate for calls made during the interim rulemaking period between November 6, 1996 and October 6, 1997, during which time PSPs had been compensated at a flat monthly rate of $45.85 per phone. Facilities-based carriers and FBRs will be able to offset any overpayments to PSPs during that period through their future compensation to the providers. And these rules assume that FLEX ANI software has been installed since 1998 to track calls in all non-ANI ii payphones that bill at a per-call rate, though as noted, this technology has not been universally implemented, and where it has been installed, it has not always worked.

## III. Related Lawsuits

The payphone industry is big business, and given the complexity of the FCC compensation rules and the slow pace at which they have been implemented, it is not surprising that several suits brought by PSPs against carriers are now pending in federal courts across the country. In five of these actions, defendants moved to dismiss or stay pending referral to the FCC. In three of these cases, courts issued stays pending referral; in the other two, they did not.

### A. The Utah Action

On October 1, 1999, two PSPs filed suit against Sprint in the United States District Court for the District of Utah, alleging that Sprint failed to provide adequate compensation for coinless payphone calls. *Flying J, Inc. v. Sprint Communications Co. L.P.*, Civil No. 1:99–CV–111–ST (D.Utah). On January 10, 2000, the court referred four issues to the FCC on primary jurisdiction grounds—"1) [t]he FBR issues; 2) [t]he retroactive adjustment or true up; 3) [t]he overpayment for calls set-off; and 4) [i]nterim payments issues." *Id.* at 13. The court found that "resolution of these issues requires the FCC's expertise and familiarity with the industry; these issues are unique to the regulated communications industry, these are issues for which uniformity is important for the regulation of the business entrusted to the FCC and for which a decision by the FCC would be helpful to this litigation." *Id.* at 10. At the same time, however, the court ordered discovery to proceed in spite of the referral. *Id.*

Referral proceedings were initiated at the FCC in March 2000 when the agency issued a public notice inviting comment on the referred issues. Sprint, APCC, and other interested parties filed comments, many of which are still under consideration by the FCC nearly two years after referral.

### B. The Virginia Action

APCC brought an action similar to the case at hand against VoCall Communica-

---

**6.** The only exception to this rule occurs when a party other than the first facilities-based carrier identifies itself to the PSP as responsi- ble for compensation; in that case, the party identifying itself must pay the PSP directly.

tions Corp. in the Eastern District of Virginia, and defendant moved to dismiss or stay pending referral to the FCC. On February 25, 2000, the court deferred decision on defendant's motion pending further briefing, and allowed discovery to continue in the interim. (Pl.Opp.Ex. 4.) The court never needed to rule on the motion, however, because the case settled and was dismissed with prejudice by stipulation of the parties on May 9, 2000.

## C.   The AT & T Action

This Court was the next to address the primary jurisdiction issue. On March 19, 1999, the plaintiffs involved in the present cases filed suit against AT & T for full compensation from dial-around calls. AT & T moved to dismiss or stay pending referral to the FCC, which the Court denied on March 9, 2000. The Court held that "at least as to the majority of this case, this is not something [where] the primary jurisdiction of the FCC should be invoked. I believe that a large portion of this case is factual. It is not subject to conflict with any ruling by any other court or by the FCC." *APCC Servs., Inc. v. AT & T Corp.*, Civil No. 99–696, at 16 (March 9, 2000) [hereinafter *AT & T* Transcript]. On May 18, 2001, this Court referred the AT & T action to a special master for discovery, which is currently proceeding.

## D.   The Pennsylvania Action

On December 14, 1998, Phone–Tel Communications ("Phone–Tel"), a PSP, filed a putative class action on behalf of all PSPs nationwide (excluding only those PSPs that were LECs) against Sprint, AT & T, and WorldCom in the Eastern District of Pennsylvania. As in the instant action, plaintiffs in the Pennsylvania case sought payment from the facilities-based carriers for all completed payphone calls. Defen-

dants moved to dismiss or stay on primary jurisdiction grounds.

On June 12, 2000, in a thoughtful and thorough opinion, the court stayed the action and referred four issues to the FCC: 1) the scope of the definition of a "completed" call; 2) creation of a per call compensation rate for the interim period between November 7, 1996 and October 6, 1997; 3) a determination of who must compensate a PSP for calls that are initially carried by a first facilities-based carrier but are subsequently terminated by an FBR; and 4) the effect of LECs' failure to implement FLEX–ANI software in accordance with FCC deadlines. *Phone–Tel Communications, Inc. v. AT & T Corp.*, 100 F.Supp.2d 313, 322 (E.D.Pa.2000). The court found that these issues were "within the special competence of an administrative agency" and that the court was therefore "require[d] to refer the matter to the [ ] agency." *Id.* at 321 (internal quotations omitted).

The FCC's response to the referral, however, has been limited. On June 27, 2001—more than one year after the court's opinion—the agency convened a conference, instructing the parties to begin exchanging information in order to identify and narrow the scope of the proceeding. To date, it appears that no further action has been taken.

## E.   The Arizona Action

The most recent court to address these issues was the District of Arizona. In *GCB Communications, Inc. v. WorldCom, Inc.*, No. CIV–00–1216–PHX–SMM, the plaintiff PSPs brought suit under 47 U.S.C. § 206 to collect compensation for all completed dial-around calls. Defendant moved to dismiss or stay pending referral to the FCC for resolution of key issues. On July 10, 2001, the court granted defen-

dant's motion, and stayed the action pending a decision by the agency on

(1) creation of a per call compensation rate for the period November 7, 1996 to October 6, 1997; (2) the effect of LECs' failure to implement FLEX–ANI technology; (3) the impact this failure has on the ability of an IXC to determine whether a call made from a payphone has actually been "completed" as defined by the FCC; and (4) what constitutes an act of an FBR identifying itself to an IXC for dial-around compensation purposes.

*GCB Communications, Inc. v. WorldCom, Inc.*, No. CIV–00–1216–PHX–SMM, Order (Jul. 10, 2001), at 17–18. The Arizona court elected not to proceed with discovery until resolution of those issues by the FCC, and to date, no further action has been taken.

## IV. History of These Actions

Plaintiffs filed these three cases on March 23, 2001, under 47 U.S.C. § 206, but have since amended the complaints in response to three arguments raised by defendants in their motions to dismiss or stay. First, in the original complaints, plaintiffs sought compensation for "every compensable call carried by [defendants] from October 7, 1997 . . . to present." (Complaint, Count I, ¶ c.) However, section 415(b) of the Communications Act imposes a two-year statute of limitations on claims brought under 47 U.S.C. § 206. Therefore, only claims accruing after March 23, 1999 are timely. Defendants' obligation to compensate plaintiffs for dial-around calls is quarterly, and arises on the first day of the annual quarter that is one quarter after the one in which those calls were made (e.g., calls made in the first quarter of 1999 became due on the first day of the third quarter of 1999). *See In re Imple-*

*mentation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket No. 96–128, Order, 13 F.C.C.R. 7303, 7305 (¶ 4), 1998 WL 166135 (Apr. 10, 1998). Compensation for calls made during the fourth quarter of 1998—from October 1 to December 31—was due on April 1, 1999, and are therefore the first series of calls that fall within the two-year statute of limitations. Plaintiffs have amended their complaints to reflect this, and now seek compensation only for calls after October 1, 1998.

Second, plaintiffs' original complaint improperly sought compensation for calls before April 20, 1999 at the now-vacated rate of $0.284 per call. (Complaint ¶ 20; Count I, ¶ c.) The amended complaint properly seeks compensation at the new rate of $0.238 per call.

Third, Count II of plaintiffs' original complaints sought an order for defendants to provide Plaintiffs for each calendar quarter since 3Q98 a computer-readable list of the toll-free (e.g., 800) numbers which traversed [defendants'] network[s] upon which [defendants] did not pay per-call dial around compensation, the volume of calls for each toll-free number, and for each of these toll-free numbers upon which [defendants] did not pay per-call dial around compensation, the name, address, contact person and phone number of the carrier to which all traffic for that toll-free number was routed by [defendants].

(Complaint, Count II, ¶ b.) In response to defendants' argument that no legal basis exists for this count—because no statute, regulation, or FCC order requires defendants to provide this information—plaintiffs have deleted Count II from their amended complaints.[7]

---

7. To the extent that defendants moved to dis-

miss the complaint based on statute of limita-

## LEGAL ANALYSIS

Defendants raise three arguments in support of their motion to dismiss. First, Qwest contends that plaintiffs' actions should be dismissed because plaintiffs have not exhausted their administrative remedies prior to bringing suit. Second, defendants—led by Sprint—argue that Count I of the complaint fails to state a claim for relief to the extent that it seeks compensation from defendants for calls transferred to FBRs. Finally, defendants argue for dismissal or a stay on grounds of primary jurisdiction.

## I. Exhaustion of Administrative Remedies

■ Section 207 of the Communications Act provides that

> [a]ny person claiming to be damaged by any common carrier ... may either make complaint to the Commission ... or may bring suit for the recovery of damages for which such common carrier may be liable ... in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

47 U.S.C. § 207. As the plain language of the statute makes clear, the two avenues of legal recourse are mutually exclusive—a party may seek damages from a common carrier, such as defendants, either before the FCC or in federal court, but not in both. See *Frontier Communications of Mt. Pulaski, Inc. v. AT & T Corp.*, 957 F.Supp. 170, 174–75 (C.D.Ill.1997). As noted, the Communications Act also contains a two-year statute of limitations clause. "All complaints against carriers for the recovery of damages ... shall be filed with the Commission within two years from the time the cause of action accrues ...." 47 U.S.C. § 415(b). Although the language of section 415(b) expressly refers only to complaints before the FCC, courts have consistently held that this statute of limitations applies equally to actions in district court. See, e.g., *Compuwill Express, Inc. v. ATX Telecomm. Servs., Ltd.*, 2000 WL 694780, at *10–11 (E.D.Pa.2000); *Black Radio Network, Inc. v. NYNEX Corp.*, 44 F.Supp.2d 565, 582 (S.D.N.Y. 1999).

Qwest argues that this interpretation of section 415(b) as applying to claims brought both before the FCC and in federal court should also encompass paragraph 114 of the *First Payphone Order*. That section provides:

> [F]or purposes of bringing a complaint before the Commission concerning a carrier's payment of payphone compensation, the time period for the statute of limitations does not begin to run until after the carrier-payor considers a compensation claim and issues a denial of that claim.

*First Payphone Order* ¶ 114. Thus, the FCC rules require any party that wishes to file a complaint against a common carrier with the Commission to first submit a claim to that carrier, and to wait until the carrier denies the claim before bringing suit. This principle was affirmed in the *Order on Reconsideration. Id.* ¶ 113. Qwest contends that this rule—that a payphone compensation claim does not accrue until 1) the PSP presents it to the long distance carrier, and 2) the carrier denies the claim—applies to all actions brought under section 207, whether the action is brought before the FCC or in federal court. Because plaintiffs have not submitted any such claim to Qwest, defendant argues that "APCC's lawsuit is unripe, and

---

tions grounds, plaintiffs' use of an invalid per-call rate, or failure to state a claim, these

arguments have been rendered moot by plaintiffs' amended complaint.

fails to state a valid claim."[8] (Qwest Mem. at 13.)

According to Qwest, this argument is grounded in both law and policy. Legally, Qwest asserts that permitting plaintiffs to bring suit in federal court without meeting the prerequisites set out by the FCC for complaints before the Commission would be tantamount to "adopt[ing] the conclusion that a cause of action for payphone compensation at the FCC would be different than a cause of action for payphone compensation in this Court." (Qwest Reply at 4 (emphasis omitted).) Qwest contends, without providing any legal support, that this proposition "has been rejected by every court that has addressed accruals of causes of action at the FCC and in court." (*Id.*) Rather, Qwest's support for this claim that "rules which define accrual of claims at the FCC apply equally to claims in district courts" is limited to cases holding that the Telecommunications Act's statute of limitations applies to cases brought both before the FCC and in federal court, even though the wording of the statute is limited to claims brought before the Commission. (*Id.* at 5.) But Qwest's argument misses the distinction between limitations imposed on federal jurisdiction by Congress, which are permissible, and those imposed by an administrative agency, which are not. For example, in *Thunder Basin Coal Co. v. Reich,* 510 U.S. 200, 114

S.Ct. 771, 127 L.Ed.2d 29 (1994), the Supreme Court held that

> we shall find that Congress has allocated initial review to an administrative body where such intent is "fairly discernible in the statutory scheme." Whether a statute is intended to preclude initial judicial review is determined from the statute's language, structure, and purpose; its legislative history, and whether the claims can be afforded meaningful review.

*Thunder Basin,* 510 U.S. at 207, 114 S.Ct. 771 (quoting *Block v. Community Nutrition Institute,* 467 U.S. 340, 351, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984)) (internal citations omitted). Under Qwest's argument, initial review of a party's claim against a carrier would be ceded in the first instance to the carrier itself, despite the plain language of section 207, which allows a plaintiff to choose to bring a claim either before the FCC or in federal court. While the FCC may impose prerequisites to the filing of an administrative claim, it may only establish such barriers to federal court jurisdiction when directed by federal statute.[9] In this case, the Communications Act explicitly vests original jurisdiction in the federal courts. The FCC's rule requiring a filing of a claim with a carrier before bringing an action must therefore be limited to those claims that are brought before the Commission.[10]

8.  The same legal analysis applies whether this argument is characterized as one based on ripeness, the failure to state a valid claim, or exhaustion of administrative remedies.

9.  To this extent, the cases cited by Qwest are inapposite. *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., Inc.,* 522 U.S. 192, 118 S.Ct. 542, 139 L.Ed.2d 553 (1997), involved a statutory prerequisite to filing a lawsuit. *Id.* at 197, 202, 118 S.Ct. 542. *Recchion ex rel. Westinghouse Electric Corp. v. Kirby,* 637 F.Supp. 1309 (W.D.Pa. 1986), addresses Fed R. Civ. P. 23.1, which imposes a demand requirement prior to a

shareholder derivative suit. *Id.* at 1318. These cases have nothing to do with administrative law, or with Qwest's argument that an agency could impose administrative prerequisites or in any way restrict federal jurisdiction in the absence of the direction of Congress to do so.

10.  Qwest's policy arguments are similarly unavailing. Defendant contends that requiring PSPs to first submit claims to the carriers themselves is consistent with the Commission's mandate regarding the 1998 verifications that the parties "work together to reconcile or explain" any disputes. *First Payphone*

## II. Compensation for Calls Transferred to FBRs

■ Defendants next argue that plaintiffs' complaints fail to state a viable claim for relief to the extent that they seek compensation from defendants for calls transferred to FBRs. Plaintiffs request payment "for each and every compensable call carried by" defendants "from each and every payphone" of the plaintiffs "from October 1, 1998 . . . to [the] present . . . ." (First Amended Complaint, Count I, ¶ c.)

As noted, the FCC clarified the relative compensation burdens for facilities-based carriers and FBRs. The *Second Order on Reconsideration* confirmed that "the logical construction of the language of the *Coding Digit Waiver Order* requires a first facilities-based carrier to pay [the PSP] unless the reseller has identified itself to the first facilities-based carrier as being responsible for paying compensation." *Id.* ¶ 7 (quoting *Bell Atlantic Order* ¶ 14.) [11] Thus, for all time periods relevant to the complaint, the Commission has unequivocally held that first facilities-based carriers must compensate PSPs unless an FBR has identified itself to the carrier as the party who is responsible for payment. This is the interpretation of the FCC orders that plaintiffs offer (Pl. Opp. to Qwest at 15–16), and it is the correct construction of the rules. The Court will therefore read plaintiffs' complaint to be consistent with this interpretation, and finds that plaintiffs' use of the phrase "each and every compensable call carried by defen-

dant[s]" is limited to compensation for calls except those for which an FBR identified itself to defendants as responsible for payment. (First Amended Complaint, Count I, ¶ c.) Under the Commission's rules, plaintiffs have no claim for compensation from defendants for any other calls, and therefore to the extent that plaintiffs seek additional payments, any claim for these payments will be dismissed.

## III. Primary Jurisdiction

Defendants next contend that the Court should refer this case to the FCC for resolution of technical issues that are within the expertise of the Commission. Under the doctrine of primary jurisdiction, courts may refer issues to an agency for its expert consideration and to help ensure elucidation and enforcement of federal regulatory requirements. *Allnet Communication Serv., Inc. v. National Exch. Carrier Ass'n,* 965 F.2d 1118, 1120 (D.C.Cir. 1992). As the Supreme Court explained,

> The doctrine of primary jurisdiction . . . is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. . . . Primary jurisdiction . . . applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires a resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative

---

*Order* ¶ 101. However, the documentation for certifying compensation payments to PSPs to which the FCC referred in this Order has never been filed by the carriers as a result of a delay imposed by the Commission. In the absence of this information, filing a claim with the carriers would likely be a futile exercise.

11. The issue in *Bell Atlantic* was on what basis a first facilities-based carrier was ex-

cused from compensating the PSP for calls switched to an FBR. Complainants asserted that a carrier was liable for all calls except those for which the FBR identified itself as responsible to the PSP. Defendants contended that the carrier was responsible for all calls except those for which the FBR identified itself as responsible to the first facilities-based carrier. The FCC unambiguously chose the latter interpretation. *Bell Atlantic Order* ¶ 14.

body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956).

■ Courts traditionally examine four factors in considering a referral motion: (1) whether the issue is within the conventional expertise of judges; (2) whether the issue lies within the agency's discretion or requires the exercise of agency expertise; (3) whether there is a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made. *Total Telecomms. Servs., Inc. v. AT & T Co.*, 919 F.Supp. 472, 478 (D.D.C. 1996).

This doctrine should, however, be invoked sparingly. *U.S. v. McDonnell Douglas Corp.*, 751 F.2d 220, 224 (8th Cir. 1984). The parties' interest in a swift resolution of their dispute must be balanced against those factors that might favor deferral.

The courts should be reluctant to invoke the doctrine of primary jurisdiction, which often, but not always, results in added expense and delay to the litigants where the nature of the action deems the application of the doctrine inappropriate.... [W]hen the agency's position is sufficiently clear or nontechnical or when the issue is peripheral to the main litigation, courts should be very reluctant to refer.... Finally, the court must always balance the benefits of seeking the agency's aid with the need to resolve disputes fairly yet as expeditiously as possible. *Mississippi Power & Light Co. v. United Gas Pipeline Co.*, 532 F.2d 412, 418–19 (5th Cir.1976). "Only if the FCC is better equipped 'by specialization, by insight gained through experience, and by more flexible procedure' to determine the lawfulness of the challenged practice, should this Court refer the matter to the FCC." *State of Vermont v. Oncor Communications, Inc.*, 166 F.R.D. 313, 320 (D.Vt.1996) (quoting *Far East Conference v. United States*, 342 U.S. 570, 575, 72 S.Ct. 492, 96 L.Ed. 576 (1952)).

In arguing the issue of primary jurisdiction, the parties often rely on conclusory statements and sweeping generalizations. Defendants, in particular, have mentioned a host of issues that they assume will arise during the course of this litigation.[12] How-

---

12. Sprint contends that for each disputed call, the Court or the FCC must resolve: 1) whether the call was a payphone call; 2) whether the call was separately transferred to an FBR that is separately responsible for compensation; 3) whether the call was "completed" under FCC rules; 4) whether compensation has been paid for the call; 5) if so, whether the proper rate was used, or an offset is required once the FCC issues a compensation rate for the interim period; 6) whether the call was coded with the proper FLEX ANI digits; 7) whether the call was "answered" by the called party, or deemed "answered" by a proxy; and 8) whether the call was routed to a reseller, and if so, the criteria used to determine whether that reseller is one with "switching" capacities (i.e., an FBR). (Sprint Mem. at 18–19.) Qwest, on the other hand,

has provided a chart of 21 legal and factual issues that it claims are part of these actions. This chart is of little or no value to the Court, since the questions raised there are either straightforward legal issues or issues that will be resolved based on factual discovery. Qwest makes no effort to analyze any of these issues under the four-factor test. Moreover, many of the issues are typical legal questions that courts frequently confront, or factual issues that will be determined through discovery—for example, "which dial-around calls from APCC's payphones were sent to Qwest's network," "which LEC provided the local phone service for each payphone," or "are any of APCC's claims barred by the two-year statute of limitations." (Qwest Mem. at 15–16.) In any event, Qwest's list seems to be shrinking; in its reply, Qwest has revised its

ever, there is little attempt to analyze these issues under the four-factor primary jurisdiction test. Defendants also appear to take for granted the threshold question—whether a resolution of these "technical" issues is necessary for this Court to proceed with these actions.

### A. Potential Issues for Referral

Since the Court is unpersuaded by the laundry list provided by defendants, it will limit itself to the issues referred to the FCC by the courts that have grappled with this issue in Pennsylvania and Arizona. These courts focused on only four issues: 1) the absence of a rate for the interim period; 2) the responsibility of FBRs to compensate PSPs for certain calls; 3) the interpretation of the FCC's order requiring implementation of FLEX–ANI technology—including the question of who bears the risk for an LEC's inability to install FLEX ANI; and 4) interpretation of the FCC's order defining a "completed" call.[13]

### 1. Absence of Rate

■ Sprint argues that this action should not proceed until the FCC has determined the rate of compensation for the interim period from November 7, 1996 to October 6, 1997. The Pennsylvania and Arizona courts both agreed, and stayed cases pending a ruling by the FCC on this issue. In the Pennsylvania action, however, plaintiff's lawsuit encompassed the interim period, which is not the case here, for APCC seeks compensation for phone calls made only on or after October 1, 1998. Accordingly, the analysis of the

Pennsylvania court is not relevant to the instant action.

As in this case, plaintiffs in Arizona did not seek compensation for calls made during the interim period. The court, however, noted that outstanding payments from IXCs to PSPs during the interim period were tied to overpayments made over the timeframe covered by the lawsuit, for which the defendant may have overpaid PSPs for some calls based on the FCC's vacated rates of $0.35 and $0.284 per call, rather than under the approved rate of $0.238 per call. In the *Third Report and Order*, the FCC held that

> IXCs may recover their overpayments to the PSPs at the same time as the PSPs receive payments from the IXCs for the Interim Period. In other words, when an IXC calculates the amount owed to each PSP for the Interim Period, it should deduct from that amount any overpayment that it made to that PSP.... In the event that the amount the IXC overpaid is larger than the amount it owes to the PSP for the Interim Period, the IXC may deduct the remaining overpayment from future payments to the PSPs.

*Id.* ¶ 198. The Arizona court focused on the provision that permits the carrier to deduct any remaining overpayment from "future payments to the PSPs," and held that "before the Court can determine what amount, if any, Defendant owes Plaintiffs, it must determine whether Defendant is entitled to deductions for overpayments that exceed the amount owed Plaintiffs for the Interim Period. This determination cannot be made until the rate for the Interim Period is established." *GCB Com-*

---

list to include only five issues that it asserts remain unresolved by the FCC. (Qwest Reply at 9.)

**13.** It is also important that the Court address these issues because one of the factors used to analyze whether primary jurisdiction applies is the risk of inconsistent rulings. *Total Telcomms. Servs.,* 919 F.Supp. at 478.

*munications* at 7. The Arizona court therefore referred the determination of a rate for the Interim Period to the FCC.

This Court respectfully disagrees. First, the *Third Report and Order* limited the offset to any "future" compensation received after implementation of the $0.24 per call rate on April 21, 1999. *Third Report and Order* ¶¶ 14, 198. The lack of a rate for the Interim Period is therefore irrelevant to a determination of plaintiffs' claims for calls made prior to that date. Second, the *Third Report and Order* did not specify which "future payments to PSPs" may be offset by any outstanding overpayments by the carriers, and the FCC gave no reason to confine the potential offset to the period covered by plaintiffs' complaint. Moreover, the FCC had not issued an order setting forth a rate for the Interim Period as of either March 23, 2001—the date plaintiffs filed this action— or July 1, 2001—the date that payment became due for all calls covered by the complaint. As a result, the calls covered by this action are not "future payments" to be offset once the rate for the Interim Period has been established, but are past payments beyond the scope of that provision of the *Third Report and Order*.[14] The FCC's determination of a rate for that period is therefore not relevant to the outcome of this case.

### 2. Issues Requiring Interpretation of FCC Orders

The Arizona and Pennsylvania courts referred three other issues, finding that resolution of each of these issues would require interpretation of FCC orders. The Supreme Court has set forth the standard for determining whether agency orders should be interpreted by the agency that issued them or by a court. "When the words of a written instrument are used in their ordinary meaning, their construction presents a question solely of law." *Great Northern Ry. Co. v. Merchants' Elevator Co.*, 259 U.S. 285, 291, 42 S.Ct. 477, 66 L.Ed. 943 (1922). However, where words are used in a "peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application, so that the 'inquiry is essentially one of fact and of discretion in technical matters,' then the issue [ ] must first go to the [administrative agency]." *Western Pacific*, 352 U.S. at 66, 77 S.Ct. 161 (quoting *Great Northern*, 259 U.S. at 291, 42 S.Ct. 477).

### a. Responsibility of FBRs for Compensation of Certain Calls

Defendants suggest that there are lingering and unresolved issues regarding the responsibility of FBRs, rather than defendants, to compensate plaintiffs for some of the dial-around calls at issue. The FCC has established a clear division of responsibility between IXCs and FBRs for compensating PSPs. In the *Bell Atlantic Order*, the agency found that for calls prior to November 23, 2001, the FBR owed compensation to the PSP for a call it terminated only if the FBR had identified itself to the facilities-based carrier as the party responsible for payment. *Id.* ¶ 14. For calls on or after that date, the agency held that "the carrier responsible for compensating the PSP for such calls is the first facilities-based interexchange carrier to which a completed coinless access code or subscriber 800 payphone call is delivered

---

14. This is the most logical interpretation of the FCC's order. The Court infers that the agency cannot possibly have intended to put all carrier payments to PSPs on hold until it determined the rate for the Interim Period, because it has been nearly four-and-one-half years since this Circuit vacated the initial rate, and nearly three years since the issuance of the *Third Report and Order*.

by the LEC unless another carrier comes forward and identifies itself to the PSP as the party liable for compensating the PSP." *Second Order on Reconsideration* ¶ 9.[15] The opinion in the Pennsylvania action was issued before these two FCC orders, and therefore that court's rationale for referring this matter to the FCC has been mooted.[16]

However, the Arizona court—ruling after the *Bell Atlantic Order* and the *Second Order on Reconsideration*—raised two concerns that led it to refer FBR-payment issues to the FCC. First, although acknowledging that the *Second Order on Reconsideration* was not currently relevant to the litigation, the court held that

> [t]o the extent the other issues this Court is referring to the FCC are not resolved prior to the time that the *Second Order on Reconsideration* applies to Defendant, however, it may very well become relevant to this litigation. The Court therefore notes that the *Second Order on Reconsideration* as it currently stands appears to be clear and unambiguous.... However, should the *Second Order on Reconsideration* become relevant to this litigation, and should the FCC take additional actions regarding the prospective period that raise new issues best resolved in the first instance by that agency, this Court may find it necessary to refer this part of the FBR issue to the FCC ....

*GCB Communications* at 13–14. Here, defendants do not assert that an interpretation of the *Second Order on Reconsideration* will become relevant to the action, and even assuming that it may, the Court

agrees with the Arizona court that the FCC's ruling was "clear and unambiguous" with regard to the payment procedure for calls that are switched to FBRs. Since the *Second Order on Reconsideration* has yet to become relevant—and may well never become relevant—the Court must presume that the agency's position is final. Indeed, the FCC affirmed that order in the *Third Order on Reconsideration*, which "decline[d] to modify the rules as established in the *Second Order on Reconsideration*." *Third Order on Reconsideration* ¶ 2. See *Association of Int'l Automobile Manufacturers, Inc. v. Massachusetts Dept. of Environmental Protection*, 196 F.3d 302, 305 (1st Cir.1999) ("the doctrine [of primary jurisdiction] compels us to defer our decision until a final [agency] position has been established"). The Court therefore finds that both the *Second Order on Reconsideration* and the *Third Order on Reconsideration* are sufficiently clear with regard to the FBR issue and that referral to the FCC is not needed.

The Arizona court also referred one question to the FCC regarding the retrospective application of the *Bell Atlantic Order*. In that order, the agency held that the first facilities-based carrier must pay the PSP "unless the [FBR] has identified itself to the first facilities-based carrier as being responsible for paying compensation." *Id.* ¶ 14. The Arizona court found that "without a more concrete definition of what actions the FCC intends to construe as an FBR identifying itself to an IXC for dial-around compensation purposes, the problem of both IXCs and FBRs indepen-

---

**15.** Only the *Bell Atlantic Order* applies to the three actions now before the Court, since plaintiffs are seeking payment for the period prior to November 23, 2001.

**16.** The Pennsylvania court found that the FCC needed to determine "which of the carriers

(the FBR or the IXC) is to compensate a PSP where one carrier with switching capabilities (the FBR) purchases long distance services from another carrier also with its own switching capabilities (the IXC) ...." *Phone–Tel*, 100 F.Supp.2d at 319.

dently denying any obligation to compensate will continue." *GCB Communications* at 15. This Court disagrees. First, defining the phrase "identifying itself" will merely require the Court to construe those words according to their "ordinary meaning." *Great Northern*, 259 U.S. at 291, 42 S.Ct. 477. There is no suggestion from the *Bell Atlantic Order* that the words are used in a "peculiar or technical sense, and [that] extrinsic evidence is necessary to determine the[ ] meaning or proper application ...." *Western Pacific*, 352 U.S. at 66, 77 S.Ct. 161. The matter is therefore properly left to the interpretation of this Court. Second, to the extent that the *Second Order on Reconsideration* was intended to clarify the *Bell Atlantic Order* and establish a more equitable system of compensation, as defendants suggest, the *Second Order on Reconsideration* relies on the same phrase—"identifies itself" in defining the compensation obligations of the parties. "[We clarify ... that the carrier responsible for compensating the PSP for such calls is the first facilities-based interexchange carrier to which a completed [dial-around] call is delivered by the LEC unless another carrier comes forward and identifies itself to the PSP as the party liable for compensating the PSP." *Second Order on Reconsideration* ¶ 9.[17] Given the chance to clarify the phrase, the FCC elected not to, using the same phrase in its prospective rule issued that same day. The FCC then declined to modify the definition again in the *Third Order on Reconsideration*, which specifically addressed issues in the *Second Order on Reconsideration*. There is no indication that

interpreting this phrase requires any technical expertise, or that the FCC needs to offer additional guidance on the subject. Therefore, there is no reason to refer the question back to the agency.

b. Implementation of FLEX ANI Technology

The next issue referred to the FCC by the other courts was the interpretation of the FCC's order requiring implementation of FLEX–ANI technology, including the question of who bears the risk for an LEC's inability to install FLEX ANI—the PSP, the carrier, or the LEC itself. The Pennsylvania court found that

[e]stablishing defendants' obligation to compensate plaintiff where defendants are unable to determine whether a call originates from a payphone requires an interpretation of the FCC's order instructing LECs to implement FLEX ANI technology. In turn, interpreting the FCC's order requiring implementation of FLEX ANI technology presents the issue of which party, the PSP or the IXC, should bear the risk of non-payment for the LEC's inability to implement FLEX ANI technology.... The choice between these and perhaps even other alternatives requires the exercise of "discretion in technical matters," and a policy judgment based upon the relative competitive positions of each entity within the telecommunications industry. The choice also requires knowledge of which alternative would cause the least amount of disruption to the telecommunications industry.

---

17. As noted, the critical dispute that was decided by the *Second Order* and the *Bell Atlantic Order*—albeit with different outcomes prospectively and retrospectively—was under what circumstances the FBR became obligated to pay—by identifying itself to the IXC or to the PSP. *Bell Atlantic Order* ¶ 14. There is

no indication that the question of what constituted an FBR "identifying itself" was ever in dispute, and in fact, the wording of the Orders implies that the FCC believed that the plain meaning of the phrase was the correct interpretation.

*Phone–Tel,* 100 F.Supp.2d at 318–19 (quoting *Great Northern,* 259 U.S. at 291, 42 S.Ct. 477) (internal citations omitted). Based on these concerns—and the fact that the FCC was considering public comment on how to handle problems caused by LECs' failure to implement FLEX ANI technology—the Pennsylvania court referred this issue to the FCC.[18]

This Court, however, will decline to refer the FLEX ANI issue to the FCC for three reasons. First, to stay this action pending referral will inevitably cause even further delay in the PSPs' efforts to collect payment for dial-around calls made from their payphones. This contradicts the explicit statements of the FCC in its orders regarding implementation of FLEX ANI software. *"The immediate implementation of this order is crucial to the Commission's efforts to ensure fair compensation for all PSPs,* encourage the deployment of payphones, and enhance competition among PSPs, as mandated by Section 276." *Bureau Coding Digit Waiver Order* ¶ 5; *Per–Phone Compensation Order* ¶ 4 (emphasis added). "We find it is in the public interest to ... allow IXCs to pay per-phone compensation where payphone-specific coding digits are unavailable from a payphone, *so that there is no further delay in the payment of payphone compensation." Id.* ¶ 17 (emphasis added). "[T]he Commission's payphone compensation rules [ ] are designed, first and foremost, to ensure that the responsible carriers compensate PSPs for all completed calls." *Third Order on Reconsider-*ation ¶ 12. Staying this action pending referral of the FLEX ANI issue to the FCC would therefore contradict the agency's mandate that PSPs be compensated as quickly as possible. It is also quite clear from the above passages that the FCC has determined that IXCs, rather than PSPs, should "bear the risk of nonpayment for the LECs inability to implement FLEX ANI technology." *Phone–Tel,* 100 F.Supp.2d at 318. Finally, effectuation of the statutory purpose of 47 U.S.C. § 276, as interpreted by the FCC, counsels against referring this matter to the FCC. *See Western Pacific,* 352 U.S. at 65, 77 S.Ct. 161.[19]

Second, it is not necessary to determine how to compensate the PSPs for calls made from payphones without FLEX ANI or with software that was not working properly, until the parties have identified how many of these phone calls were made during the relevant period. Plaintiffs retain the burden of proving that uncompensated phone calls exist before the proper rate need be determined. As counsel for plaintiffs noted in the *AT & T* case, "[t]he question was never whether [the IXCs] could identify them. The question is which technology they opt to use to track them as part of their independent determination as to how to go forward. So those numbers are there." *AT & T* Transcript, at 14. Once the parties complete the substantial task of determining the number of outstanding phone calls, then the FLEX ANI issue may become relevant.[20]

---

18. The Arizona court found the reasoning of *Phone–Tel* persuasive and also referred the question to the FCC. *GCB Communications* at 9.

19. The Court is also hard-pressed to believe that plaintiffs should bear the burden of a delay in receiving compensation that is the result of the failure of other parties to imple-ment technology, such as FLEX ANI, that those entities volunteered to use.

20. Given the extensive discovery that is likely to occur in the three cases before this Court, it is possible that any conceivable issue that may ultimately require resolution by the FCC in these cases will already have been resolved by the FCC as a result of the referrals from the Utah, Pennsylvania, and Arizona courts.

Third, the FCC has already provided detailed guidelines for compensating PSPs for calls made from payphones without FLEX ANI technology.

> Pursuant to the waiver we grant herein, beginning October 7, 1997, IXCs must either pay per-call, or per-phone compensation as described below, for payphones that do not provide payphone-specific coding digits.... IXCs who choose to pay per-phone compensation pursuant to the waiver granted herein, must use payphone call volume information that is already available to them to determine the call volumes for when a payphone should be compensated when payphone-specific coding digits are not available for a specific payphone. An IXC may choose to compensate those payphones that are not capable of providing payphone-specific coding digits on a per-call basis where the IXC maintains a per-call tracking mechanism .... We note that the default rate established in the *Second Report and Order*, $0.284, which terminates at the conclusion of per-call compensation—October 7, 1999—will continue to remain in effect as a default compensation rate ... for calls originated from those payphones that are not able to provide payphone-specific coding digits.[21]

*Per–Call Compensation Order* ¶ 18. The *Per–Call Compensation Order* then sets forth detailed methodology for how IXCs should compensate PSPs for calls made from phones without FLEX ANI technology. *Id.* at 10,904–13 (¶¶ 21–32). Given the establishment of this intricate payment scheme by the agency, as well as the FCC's directive that PSPs be compensated

as rapidly as possible and the extensive underlying factual discovery necessary to determine the scope of the compensation due plaintiffs, the Court concludes that the doctrine of primary jurisdiction counsels against referral of the FLEX ANI issue.

c. Definition of a "Completed" Call

The final issue referred to the FCC by other courts was related to the definition of a "completed call." The FCC has defined a "completed" call as one "that is answered by the called party." *First Payphone Order* ¶ 63. Defendants argue that this definition is pragmatically insufficient, and that the FCC must, for example, determine whether to permit proxies for call completion, such as duration of the call. The Pennsylvania and Arizona courts hesitantly referred this issue to the FCC.

> At first glance, the issue of what constitutes a "completed" call appears to be one of statutory interpretation well within the conventional experience of judges. Were the scope of the definition of a "completed" call the only issue before the court, the court would be disinclined to defer to the FCC. However, the definition of a 'completed' call is dependent upon the LECs' ability to implement FLEX ANI technology, an issue the court has already referred to the FCC.

*Phone–Tel*, 100 F.Supp.2d at 321; *see GCB Communications* at 10–11. Because this Court has not referred any other issues to the FCC, the reasoning of the other courts is not applicable. Moreover, the FCC defined a completed call—as a call that has been answered—in September 1996, and has since affirmed the definition. *See First Payphone Order* ¶ 63.[22] In the

---

21. Of course, the $0.284 rate was vacated by this Circuit. *MCI Telecomms.*, 143 F.3d at 609.

22. In that order, the Commission expressly considered and rejected using a duration sur-

rogate for completed calls. "We conclude that exempting calls from per-call compensation because they are not of a requisite duration, whether 25 seconds or 60 seconds, would not be in accordance with Section

*Third Order on Reconsideration,* the FCC explicitly rejected WorldCom's petition to modify the definition, holding that "World-Com's proposed redefinition runs contrary to our longstanding definition of 'completed' calls to mean calls completed to the called party." *Third Order on Reconsideration* ¶ 7. To the extent that this definition needs any further interpretation, there is nothing technical about the use of the phrase "answered by the called party." If need be, this Court can apply that definition to the facts as determined by discovery.[23]

### B. General Factors Weighing Against Referral

In addition to finding that no specific issues warrant referral to the FCC, the Court notes that three other factors counsel against staying this action and deferring to the agency.

First, the risk of inconsistent rulings in this matter is slight because, as noted, the four largest IXCs are currently defendants in parallel cases before this Court. To the extent that the FCC alters its current regulatory framework for payphone calls before these actions are resolved, this Court will undertake to ensure that the changes are applied to all four cases before it.

Second, the lack of progress in the Pennsylvania and Arizona actions since they were stayed pending referral to the FCC counsels strongly against a similar path in this case. The Pennsylvania action was referred in June 2000; the Arizona case was stayed in July 2001. To date, it appears that there has been no progress in those cases. In fact, Qwest goes so far as to argue that the plodding pace of the resolution of issues before the FCC actually militates in favor of referral. "[G]iven the length of time that the FCC has taken (five years) in addressing payphone compensation and it still has not finished, it is reasonable to conclude that the Court might have to render final judgments (or certainly resolve dispositive motions) before the FCC issues key rulings." (Qwest Reply at 10.) This argument misses the point entirely—the doctrine of primary jurisdiction is more apt where agencies can resolve pending issues in a timely manner; a long delay cautions against referral. *See AT & T Communications v. City of Dallas,* 8 F.Supp.2d 582, 590 (N.D.Tex.1998) (denying motion to dismiss or stay on primary jurisdiction grounds where "[r]eferral to the FCC would lead to lengthy delays, primarily as a result of the Agency's requirement to issue notice and obtain public comments before ruling [and] AT & T's interest in speed outweighs any benefit that might be obtained by soliciting the FCC's opinion on the particular matters at hand"). The Court therefore finds that the interest of judicial efficiency dictates that these actions proceed.

Finally, to the extent that any issues in these actions may ultimately need to be

---

276's mandate that 'each and every completed intrastate and interstate call' be compensated." *Id.*

**23.** Defendants rely heavily on *Mical Communications, Inc. v. Sprint Telemedia, Inc.,* 1 F.3d 1031 (10th Cir.1993), in which the court ordered issues involving billing and collection services for area code 900 calls referred to the FCC. "[T]his case involved the appropriate characterization of a specific and relatively new service, in a rapidly changing industry,

which has already been the subject of a number of orders and rulings by the FCC, none of which appears to address the *precise* issue here. And that precise issue is pending before the FCC now." *Id.* at 1039–40 (emphasis in original). Unlike *Mical,* however, the FCC has ruled on the issues that are necessary to the disposition of these cases, and plaintiffs have not shown that there is a precise issue currently pending before the agency that significantly militates for referral.

resolved by the FCC, the Court believes that proceeding with discovery at this time is the most prudent path. First, factual discovery will enable the parties to crystallize any legal issues that may ultimately need to be referred to the FCC. For example, once the parties identify how many calls were made from phones with FLEX ANI technology that was not working properly, it may be more appropriate to seek a Commission ruling on the proper compensation method for those calls. Second, given the extensive amount of discovery that is likely to occur in all three of these cases, it will probably be some time before these legal issues become relevant to the case, assuming that they are pertinent at some point. If that happens, it is possible that the FCC will have ruled on the issues as a result of the referrals in the Utah, Pennsylvania, and Arizona actions— or at the very least, the Commission will have made substantial progress toward issuing an order. In this way, it is hoped that a decision not to stay these actions will promote a more efficient resolution of these matters.

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss or stay pending referral to the FCC are denied. A separate order accompanies this Opinion.